# United States Court of Appeals
## For the First Circuit

No. 03-1564

GEOFFREY WOOD,

Plaintiff, Appellant,

v.

HANCOCK COUNTY SHERIFF'S DEPARTMENT;
SHERIFF, HANCOCK COUNTY; AND LINDA HANNAN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Selya, Circuit Judge,
Coffin and Stahl, Senior Circuit Judges.

Sandra Hylander Collier for appellant.
Peter T. Marchesi with whom Wheeler & Arey, P.A., was on brief
for appellees.

December 31, 2003

**COFFIN, <u>Senior Circuit Judge</u>.** Appellant Geoffrey Wood claims that he was unconstitutionally strip searched on three separate occasions by correctional officers at the Hancock County Jail in Ellsworth, Maine.  He filed a lawsuit seeking damages under 42 U.S.C. § 1983 from the county, the sheriff, and the jail administrator, but a jury found in favor of the defendants.[1]  On appeal, Wood contends that he is entitled to a new trial because the district court incorrectly instructed the jury on both the definition of a strip search and the law governing routine strip searches of inmates after contact visits.  We see no error as to the law applicable to post-contact visits, but have concluded that a sufficiently misleading definition of a strip search warrants a partial new trial.

## I. Factual Background

In mid-2001, appellant Wood was arrested twice on misdemeanor charges and required to completely disrobe three times in the presence of correctional officers.  The first two episodes occurred as part of his processing into the Hancock County Jail following

---

[1] The complaint, whose caption identifies Sheriff William Clark and Administrator Linda Hannan by their titles, and the verdict form, which asks for a single judgment against all three defendants, indicate that the individuals were sued only in their official capacities.  As such, their liability under 42 U.S.C. § 1983 is indistinguishable from the county's, and our analysis therefore proceeds on the assumption that only governmental liability is at issue. <u>See</u> <u>Brandon</u> v. <u>Holt</u>, 469 U.S. 464, 472 n.21 (1985); <u>Nereida-Gonzalez</u> v. <u>Tirado-Delgado</u>, 990 F.2d 701, 705 (1st Cir. 1993).

the arrests.  Although Wood characterizes these events as strip searches, the county defendants maintain that the encounters were "clothing searches" and that any observation of Wood's naked body was incidental to the correctional officers' purpose to examine his clothing.  The third search occurred on the morning after Wood's second arrest, following a contact visit with his attorney.  The parties agree that Wood was subjected to a strip search at that time, but disagree about its constitutionality.

The details of these three incidents, with the facts largely depicted in the light most consistent with the jury's verdict, are described below.  Before turning to those details, we briefly review the jail's relevant search policies.

According to Policy No. C-120, titled "Admissions Procedures – Inmates Not Bailed," an individual who is being assigned to a housing unit in the jail – whether charged with a misdemeanor or felony – is subject to a clothing search and must shower after disrobing "in the presence of [a] Corrections Officer."  Jail Policy D-220 (Procedure C(1)), titled "Search Procedures," states that a pre-trial inmate charged with a misdemeanor offense – like appellant – is subject to a more intrusive strip search only if the officer "has reasonable suspicion that [the] inmate is concealing contraband and is about to come into contact with inmates of the facility."

A "clothing search" is defined as "[t]he removal and search of all of an inmate's clothing,"[2] while a "strip search" is defined as "[a] visual search of an inmate which requires the removal of all clothing, to include a search of the clothes removed."  Policy D-220.[3]  Thus, individuals arrested for a broad range of minor

---

[2] The clothing search process is described by Policy D-220 (Procedure K(4)) as follows:

As the inmate removes each piece of clothing they will hand it to the officer who will thoroughly check it for contraband.  Once all clothing has been checked the inmate will be given back the clothing he/she may retain. The rest of the clothing will be inventoried and placed in the property box assigned to that inmate.

Jail Policy C-120, which covers admissions procedures, also addresses clothing searches.  It states, in relevant part:

1. In order to ensure the health, safety and security of the inmates and staff, each inmate being assigned to a housing unit will be required to shower as part of the admissions process.  Inmates will disrobe and shower while in the presence of the Corrections Officer (same sex) in the shower room located in the medical room.

2. The Corrections Officer will conduct a search of the inmate[']s clothing and personal effects for contraband and vermin as the inmate prepares to shower. . . .

[3] The strip search process is described by Policy D-220 (Procedure C(5)) as follows:

Once the inmate has removed all their clothing and handed it to the officer, the officer shall conduct a visual search of the inmate to include having the inmate shake out their hair, check inside the mouth, ears, nose, their arm pits, bottoms of their feet, under the scrotum (where applicable), lift their breasts (where applicable) and finally have the inmate bend over, spread their butt cheeks and cough. In addition, the inmate's clothing and footwear shall be searched.

offenses classified as misdemeanors, including failure to pay highway tolls or speeding, could be asked to disrobe completely and shower if they are unable to post bail and must be assigned housing. Only felony detainees and those suspected of carrying contraband are subject to the more extensive examination that the policy describes as a "strip search."

Search #1. On May 27, 2001, Wood was arrested on misdemeanor charges of domestic abuse and taken to the Hancock County Jail. He did not immediately post bail and therefore was required to shower and undergo a clothing search. He was escorted by a correctional officer into a room near the booking area known as "the nurse's station" or "medical room" and directed to disrobe, one article of clothing at a time, until he was naked. He was standing four to five feet from the officer. Wood contends that two officers were present, but jail records indicate that only Officer Christopher Rivers supervised the search and shower.

Officer Rivers testified that his standard practice in clothing searches is to instruct the inmates to turn over their underwear last and then to enter the nearby shower stall. Although Rivers said the objective of the search is to detect contraband in the clothing, he and a fellow officer, Chad Wilmot, both testified that they "maintain a visual" on the individuals as they disrobe and enter the shower. Rivers stated that, during the process, the inmates end up standing naked for "[s]econds," and Wilmot noted

that "[w]e're not physically inspecting them, having them raise their arms or anything like that, and we're also bringing clothes and a towel so that they can dry off and change up when they get out of the shower."[4]

The jail's administrator, Linda Hannan, testified that the corrections staff attempts to provide as much privacy as possible in the circumstances.[5] She said that the shower curtain, which was admitted into evidence, is black from about shoulder height down, and she further stated that the officers are trained to avert their eyes from the inmate during the clothing search. She acknowledged that officers might observe the inmate's naked body "for a split second as [they] reach for that last piece of clothing." Hannan's depiction of the policy departed somewhat from the two officers' consistent report that they were trained to maintain eye contact with the inmate and that they were not trained to look away because "that would be an officer safety issue."

---

[4] Contrary to the officers' report, Wood testified that, after he showered and while still naked, he was ordered to raise his hands over his head and to turn around completely. He further claimed that he was directed to open his mouth and move his tongue around and ordered to bend down, facing away from the officers, and to touch his toes.

[5] Multiple provisions of Policy D-220 call for sensitivity in implementing searches. Procedure A states that "[j]ail staff will conduct searches in the least degrading manner possible," and Procedures C(4) and K(3) state that strip searches and clothing searches "shall be conducted in private only by and in the presence of, the minimum number of officers of the same sex as the inmate, which are necessary to accomplish the search and to maintain security and protection."

Search #2.  Wood was arrested again on July 10 and charged with violating a protection from abuse order.  He again was brought to the Hancock County Jail and searched in similar fashion to the May occurrence.[6]  He remained at the jail overnight.

Search #3.  On the morning of July 11, appellant was twice visited by his attorney.  Both encounters were "contact" visits, meaning that counsel and client were face-to-face without a glass partition or other divider separating them.  Although jail policy calls for inmates to be strip searched after all contact visits,[7] appellant was not searched after the first session with his counsel.  After the second, longer visit, however, as appellant and his counsel passed through the booking area, the booking officer stated that appellant needed to be strip searched pursuant to jail policy.  He was taken into the same room where the previous searches had been conducted, and a full strip search was done.  He was asked to fully disrobe, and then was ordered to stick out his tongue, hold his hands above his head, turn around, bend over, and manually spread his buttocks.

[6] Appellant testified that he again was further searched after he showered, while naked.  He stated that he was told to raise his hands over his head, turn around 360 degrees, open his mouth and move his tongue around, and rub his fingers through his hair.

[7] Policy F-150 on "Inmate Visiting" states that "[a]fter any contact visit, all inmates will be strip searched before being returned to their housing unit or work area."

Appellant contends that all three of these searches violated his Fourth Amendment right to be free from unreasonable searches and that the jury was led to conclude otherwise by the trial court's erroneous instructions.  With respect to the first two searches, appellant argues that, despite being labeled "clothing searches," they effectively were strip searches.  The parties agree that the search constitutes a Fourth Amendment violation if it was indeed a strip search.  See infra at 10-11.  Appellant asserts that the jury was led astray because the court's instruction improperly limited the definition of a strip search.  See infra at 10.  He claims that the instruction concerning the third search – undisputedly a strip search – erroneously established a presumption of reasonableness regarding strip searches after contact visits.  See infra at 21-23.

Defendants assert in response that the court's instructions accurately reflected the law and that the jurors properly found no constitutional violation.  They insist that the May 27th and July 10th searches were carefully limited clothing searches, not strip searches, and as such involved permissible incidental viewing of appellant's naked body.  In any event, they say, the label given to the first two searches is unimportant because the jury's verdict is supportable even if appellant were subjected to unlawful strip searches.  They assert that the verdict form may be interpreted to reflect a judgment that the defendants – the county and its

-8-

supervising officials – were not liable for the officers' conduct because the officers' actions did not represent a widespread practice or custom. See Monell v. New York Dep't of Social Servs., 436 U.S. 658, 694 (1978); Miller v. Kennebec County, 219 F.3d 8, 12-13 (1st Cir. 2000). Finally, defendants assert that the July 11th strip search was "wholly constitutional" and that the court's instruction correctly set out the law governing routine strip searches following contact visits.

For the reasons discussed below, we conclude that appellant is entitled to a new trial on the claims related to the May 27th and July 10th searches, but we uphold the jury's judgment on the July 11th strip search.

## II. Discussion

A jury instruction that was objected to at trial will constitute reversible error "'only if it (i) is "misleading, unduly complicating, or incorrect as a matter of law"; and (ii) cannot be considered harmless . . . .'" Richards v. Relentless, Inc., 341 F.3d 35, 46 (1st Cir. 2003) (citations omitted). In probing whether the error could have affected the outcome of the jury's deliberations, we consider its impact in light of the entire record. See Tum v. Barber Foods, Inc., 331 F.3d 1, 8 (1st Cir. 2003) (citing Federico v. Order of St. Benedict, 64 F.3d 1, 4 (1st Cir. 1995) and Allen v. Chance Mfg. Co., 873 F.2d 465, 469 (1st Cir. 1989)).

With this guidance in mind, we consider in turn each of the challenged instructions.

A. <u>Definition of Strip Search</u>

The district court defined a strip search to the jury as follows:

> A strip search involves a deliberate, visual inspection of the naked body of a prisoner which includes the examination of the mouth and armpits. A visual body-cavity search is a strip search that includes visual inspection or visual examination of the anal and genital areas.

Appellant objected to this instruction and proposed an alternative to the court that more broadly defined such a search, essentially classifying any required exposure of a private body part as a strip search.[8]

The definition of a strip search was crucial to appellant's case. Our case law holds that an individual detained on a misdemeanor charge may be strip searched as part of the booking process only if officers have reasonable suspicion that he is either armed or carrying contraband. <u>See</u> <u>Savard</u> v. <u>Rhode Island</u>,

_____

[8] Appellant's requested version was as follows:

> A strip search includes any exposure or observation of a portion of a person's body where that person has a reasonable expectation of privacy. This specifically includes prisoners who are watched by corrections personnel while they change from personal clothing into detention clothing.

338 F.3d 23, 27 (lst Cir. 2003) (en banc) (opinion of Selya, J.), petition for cert. filed, 72 U.S.L.W. 3348 (U.S. Nov. 3, 2003) (No. 03-683); Roberts v. Rhode Island, 239 F.3d 107, 113 (lst Cir. 2001). In so concluding, we have recognized that "strip searches are intrusive and degrading []and, therefore, should not be unreservedly available to law enforcement officers[]." Savard, 338 F.3d at 27. When such an intrusion is extended to relatively harmless offenders, "a severe incursion on privacy" occurs, Roberts, 239 F.3d at 111.

In Savard, for example, one of the strip-searched plaintiffs had been arrested for a traffic ticket that had been issued to his son six years earlier and never paid; another was arrested in error for failing to appear for a probation review after her probation had ended. See 338 F.3d at 33 (opinion of Bownes, J.). Requiring particularized suspicion to strip search misdemeanant arrestees balances institutional security needs with individual privacy, which includes "a reasonable expectation not to be unclothed involuntarily, to be observed unclothed or to have [one's] 'private' parts observed or touched by others." Justice v. City of Peachtree City, 961 F.2d 188, 191 (11th Cir. 1992) (citation and internal quotation marks omitted). There is no dispute that Wood was not suspected of carrying a weapon or contraband either time he was arrested and booked. Thus, if he was strip searched, he suffered a constitutional injury.

Having carefully reviewed the relevant precedent, we believe the court's instruction erroneously circumscribed the jury's evaluation of the evidence. Nearly twenty years ago, we defined a strip search as "an inspection of a naked individual, without any scrutiny of the subject's body cavities," Blackburn v. Snow, 771 F.2d 556, 561 (1st Cir. 1985),[9] and we repeated substantially that same description in subsequent cases. See Savard, 338 F.3d at 25 (defining strip searches as "visual inspections of the naked body"); Roberts, 239 F.3d at 108 n.1 ("A 'strip search' involves a visual inspection of the naked body of an inmate."). See also Peckham v. Wisconsin Dep't of Corrections, 141 F.3d 694, 695 (7th Cir. 1998) ("strip search" refers to "a visual inspection of a naked inmate without intrusion into the person's body cavities").[10]

---

[9] We recognized in Blackburn that "strip search" is an "umbrella term" covering several increasingly intrusive procedures. In addition to the general term, defined as quoted above, we noted that a "'visual body cavity search' extends to visual inspection of the anal and genital areas" and that a "'manual body cavity search' includes some degree of touching or probing of body cavities." 771 F.2d at 561 n.3; see also Savard, 338 F.3d at 25 (separately defining "visual body cavity searches" as "inspections of the anal and genital areas.")

[10] We recognize that a strip search may occur even when an inmate is not fully disrobed, but this case does not require us to explore when "something less than full nudity," Stanley v. Henson, 337 F.3d 961, 964 (7th Cir. 2003), would constitute a strip search. See, e.g., Amaechi v. West, 237 F.3d 356, 365 & n.15 (4th Cir. 2001) (noting that Virginia statutory definition, similar to most states, provides that "'[s]trip search shall mean having an arrested person remove or arrange some or all of his clothing so as to permit a visual inspection of the genitals, buttocks, anus, female breasts, or undergarments of such person'") (emphasis added and deleted).

-12-

The district court departed from these formulations by defining a strip search to include an "examination of the mouth and armpits," and by stating that the inspection must be "deliberate." Although strip searches often may involve additional steps, we decline to draw the line so narrowly that standing naked for inspection by officers falls short of being a strip search if unaccompanied by a demand to open one's mouth or lift one's arms. Unquestionably, the serious intrusion stems from exposing one's naked body to official scrutiny; the impact of that forced nudity is undervalued if focused attention on the mouth and underarms is also required to reach the threshold of a strip search.

Under the court's instruction, the most deliberate visual inspection of a naked body, even including a look in the mouth, would pass muster, simply because one or two armpits were not inspected. Alternatively, a complete and prolonged viewing of a naked body could survive challenge if a jury were to find that it was not sufficiently "deliberate" because it was designed to examine clothing rather than the body.

The court's instruction was therefore flawed in two respects. By adding the word "deliberate" to the definition we previously have adopted – stating in the first portion of its instruction that "[a] strip search involves a deliberate, visual inspection of the naked body of a prisoner" – the court unduly directed the jurors to the officers' subjective intent. The word "inspection"

sufficiently connotes the need for a focused look.  See The Random House Dictionary of the English Language (2d ed. 1987) (unabridged) at 987 (defining "inspection" as "the act of inspecting or viewing, esp. carefully or critically . . . ," and, alternatively, as "formal or official viewing or examination").[11]  Whether or not the officers set out deliberately to inspect a prisoner's naked body is not the question; it is, rather, whether the officers did, in fact, perform such a search.  The remainder of the instruction then added specific elements to the definition – scrutiny of the mouth and armpits – that are not prerequisites for finding that a strip search took place.

---

[11] "Inspect" is defined as "to look carefully at or over; view closely and critically," as well as "to view or examine formally or officially."  See The Random House Dictionary, at 987.

These variations cannot be considered harmless in this case.[12] Although the jury may not have based its judgment for defendants on the scope of the searches – an issue we discuss infra at 16 – the problems with the instruction were sufficiently critical to the jury's deliberations that appellant is entitled to have the issue re-submitted to a jury. We begin our explanation of that conclusion with a brief review of the evidence of what occurred.

---

[12] We note that appellant's proposed alternative also was flawed. His version, defining a strip search to include any exposure or observation of private body parts, would seem to extend our accepted formulation by including incidental viewing of portions of the body.

That appellant's request overshot its mark does not nullify his objection to the court's instruction. Although he was not entitled to his request, see Estate of Keatinge v. Biddle, 316 F.3d 7, 17 (1st Cir. 2002) ("A refusal to give a particular instruction constitutes reversible error only if the requested instruction was . . . correct as a matter of substantive law . . . ."), his objection – that the court too narrowly defined a strip search – was stated with sufficient specificity to meet the "distinctness" requirement of Fed. R. Civ. P. 51. The Rule provides that, to preserve an objection to an instruction, a party must "stat[e] distinctly the matter objected to and the grounds of the objection." Fed. R. Civ. P. 51(c)(1). Counsel made the following objection:

> To the extent that your definition – the court's definition of a strip search involves a . . . deliberate . . . visual inspection and continues on to include the phrase which includes the examination of the mouth and armpits. The basis for the objection is the First Circuit seemingly – it seems to have approved a broader definition of what a strip search might involve.

The court replied, "Any other objections?"

Particularly in light of our longstanding precedent on strip searches, counsel's objection served as adequate notice of appellant's claim of error. Cf. Keatinge, 316 F.3d at 15; Parker v. City of Nashua, 76 F.3d 9, 12 (1st Cir. 1996).

-15-

Appellant testified that he was subjected to examinations that met the district court's definition of a strip search, including scrutiny of his mouth and armpits, see supra notes 4 & 6, while the officers testified that the only viewing of appellant's naked body occurred in the few seconds after he had completely disrobed while they "maintain[ed] a visual" on him before he entered the shower. Defendants emphasize that, even if the jurors had accepted appellant's version, the jury properly may have found no liability against the county.

As first set forth by the Supreme Court in Monell, a governmental entity may not be held liable under 42 U.S.C. § 1983 for constitutional violations committed by its employees unless the plaintiff's injury results from either an officially sanctioned policy or from a custom or practice that is "so well-settled and widespread that the policymaking officials . . . can be said to have either actual or constructive knowledge of it yet did nothing to end the practice," Bordanaro v. McLeod, 871 F.2d 1151, 1156 (1st Cir. 1989). In the latter case, "the custom must have been the cause of and the moving force behind the deprivation of constitutional rights." Id.; see also Miller, 219 F.3d at 12. Thus, in rejecting liability, the jury may have believed appellant but concluded that the officers acted randomly beyond the jail's policies.

Another possibility, however, is that the jury believed the officers' description of what occurred and concluded – consistent with the jury instruction – that these were not strip searches because there was no check of appellant's mouth or underarms. Such a conclusion would have made unnecessary any further discussion about the specific nature of the search and whether the visual observation of appellant constituted an "inspection" that would qualify as a strip search.

In our view, if the jury had had such a discussion, with the benefit of the correct definition of "strip search," it could have reached a different result. Both officers testified that appellant was under constant watch as he disrobed. See supra at 5. Officer Wilmot stated that the officers are "physically inspecting the clothes, not the person," but he replied affirmatively when asked by counsel if the process necessarily included "maintain[ing] a visual of their body while they're in the process of disrobing." In addition, while Administrator Hannan stated that the only target of the search was appellant's clothing, she acknowledged that officers conducting clothing searches must at least observe inmates "out of the corner of [their] eye[s]" to be sure the prisoners do not take contraband from their clothing and hide it on their persons. She explained that the concern about concealment is why disrobing for a clothing search must be done in an officer's presence rather than behind a screen or in another private area.

-17-

Based on this evidence, a properly instructed jury could have decided that both clothing searches performed on appellant embraced a visual inspection of his naked body that – albeit brief – was focused on detecting contraband, and thus amounted to a strip search. Our precedent does not require that a search be either prolonged or thorough to be termed a strip search, and we decline to add such limitations. The critical question is whether viewing the naked body was an objective of the search, rather than an unavoidable and incidental by-product. Had appellant been allowed to disrobe behind a screen, for example, and directed to enter the shower while officers examined the clothes he left behind, the momentary exposure as he walked from the screen to the shower clearly would have been incidental to the search of his clothing. By contrast, the procedure utilized by the Hancock County Jail in this case, as described by the officers, allowed visual inspection of appellant's body through the progressive stages of his undressing. Indeed, the combined effect of Administrator Hannan's and the officers' testimony permits — although it does not compel — the inference that, during clothing searches, officers routinely keep watch through the disrobing process, at least in part, to be sure no items are secreted on the body.[13]

---

[13] We note that, to the extent that a behind-a-screen disrobing would be less effective in detecting concealed items, that might simply be an unavoidable consequence of protecting an individual's right to privacy. Our case law on misdemeanor arrestees effectively holds that, even if the only way to be comprehensive in

Although less objectionable than more sustained inspections of an individual's naked body, and less intrusive than a search that includes examination of the mouth and underarms, the search that occurred here unquestionably implicated the "reasonable expectation not to be unclothed involuntarily," Justice, 961 F.2d at 191 (internal quotation marks and citations omitted). Appellant is entitled to have a properly instructed jury decide whether it crossed the line from incidental observation to impermissible inspection.

Having determined that the erroneous instruction could have impacted the jury's verdict, we reject defendants' fallback contention that such error should not lead to a new trial because the jury's judgment may have signaled a determination that the searches – lawful or not – did not stem from a widespread practice or custom attributable to the defendants.[14] That possibility is not enough, however, to avoid retrial. Appellant is entitled to a new trial unless the error, which was preserved by objection, can be deemed harmless. On this record, we cannot say that the jurors

_____

detecting contraband is to perform a strip search, the government must bear the risk of missing some items. We emphasize that we are not holding that "clothing searches" must allow private areas for undressing; we simply wish to point out that balancing constitutional rights and institutional needs may require that, in situations presenting only a remote risk of concealment, we accept less than perfect law enforcement procedures.

[14] The jury was not asked to consider whether the strip searches stemmed from an official policy, the other Monell prong. See supra at 16.

-19-

probably would have found the defendants blameless if they found that a constitutional violation occurred.

The record contains adequate evidence to permit a jury to conclude that appellant's experience was typical of clothing searches at the Hancock County Jail. First, appellant testified that when he asked on May 27th at the outset of the search why he needed to take off his clothes, he was told it was "routine procedure." Second, Officer Rivers, after testifying that memos are generated on searches only when circumstances require multiple officers to participate, stated that no memo was prepared on the May 27th search because "[i]t was a routine search to me." Third, the fact that appellant himself experienced two separate searches conducted similarly by two different officers, on two different dates, further suggests a standard practice. Finally, the jurors could have viewed the standard clothing search as described by Administrator Hannan to include at least a brief inspection of inmates' naked bodies. On that basis – and with the correct definition of a strip search in mind – the jury may have found official knowledge of a practice of strip searching misdemeanants.

In so concluding, we hasten to add that the defendants' assertions to the contrary do not indicate an attempt to mislead. The labels applied to searches do not always reflect a common understanding of the procedures that will be utilized. Although the Hancock County Jail officers disclaimed doing strip searches,

for example, their understanding of what such a search entails is informed by the jail's policy.  And, while the strip search definition contained in Policy D-220 is consistent with our precedent – "[a] visual search of an inmate which requires the removal of all clothing, to include a search of the clothes removed" – the detailed procedures spelled out for a strip search have the effect of narrowing the scope of the definition by requiring particularized scrutiny of certain body parts.  See note 3 supra.[15]  Thus, a jury could find that defendants truthfully denied conducting strip searches, within their understanding of what that entailed, but nonetheless committed a constitutional violation by inspecting appellant's body in a manner that federal law would deem a strip search.

We therefore conclude that appellant is entitled to a new trial on his claims of constitutional injury arising from the searches on May 27th and July 10th.

B. Instruction on Post-Contact Visit Strip Search

Appellant's second complaint centers on the court's instruction on the July 11th strip search:

> I'll now discuss with you the alleged July 11th, 2001 postcontact strip-search issue.  I instruct you that without more strip-searching all prisoners after all contact visits in order to prevent smuggling of

---

[15] Indeed, John Hinkley, the Maine Department of Corrections' jail inspector, testified that the state, through rules set by the attorney general's office, defines a strip search to include a body cavity search.

-21-

contraband is not unreasonable under the Fourth Amendment.

However, plaintiff may present to you additional facts that make the application of a postcontact visit strip-searching policy unreasonable under the circumstances of this case. In the postcontact visit context, a search is reasonable where the need for the search outweighs the resulting invasion of privacy.

Among those things you should consider when making this determination are the scope of the search, the manner in which it was conducted, the justification for initiating it, and the place where it was conducted. When balancing these interests, keep in mind that the central objective of jail administration is safeguarding institutional security. You should accord deference to the policies and practices that jail administrators consider necessary to preserve internal order and discipline.

Remember, in order to recover, plaintiff must prove by a preponderance of the evidence that his strip search following a contact visit on July 11th, 2001, was unreasonable. . . .

Appellant argues that this instruction failed to follow the blueprint for evaluating strip searches that the Supreme Court set out in Bell v. Wolfish, 441 U.S. 520, 558-60 (1979). In considering the constitutionality of a prison's blanket policy of strip searching inmates after contact visits, the Court articulated a "test of reasonableness" that requires "a balancing of the need for the particular search against the invasion of personal rights that the search entails." Id. at 559. Factors to be weighed are "the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Id. Applying that test, the Court in Bell upheld the strip searches at issue.

-22-

Appellant's two-pronged argument is, first, that the district court improperly preempted the jury's balancing by directing it to presume the July 11th search was reasonable, and, second, that the court then unfairly cemented the presumption by advising the jury to defer to jail policies and practices.  We conclude that the instruction as given fairly presented the relevant law.

We agree with appellant that the Bell balancing test is the correct starting point for assessing any strip search.  But Bell and other cases lead inevitably to the district court's conclusion that it is presumptively reasonable for a detention facility to conduct strip searches after contact visits.  In Bell, the Court recognized that all such facilities are "fraught with serious security dangers," and that smuggling of drugs, weapons and other contraband "is all too common an occurrence," id.  The Court further observed that the lack of reported cases of smuggling at the Metropolitan Correctional Center in New York, the institution at issue in Bell, "may be more a testament to the effectiveness of this search technique as a deterrent than to any lack of interest on the part of the inmates to secrete and import such items when the opportunity arises," id.

The particular risk posed by contact visits is a theme repeated in the case law and substantiated by this record.  In Block v. Rutherford, 468 U.S. 576, 586 (1984), the Supreme Court

made the following observations in deciding that a detention facility could constitutionally prohibit contact visits:

> Contact visits invite a host of security problems. They open the institution to the introduction of drugs, weapons, and other contraband. Visitors can easily conceal guns, knives, drugs, or other contraband in countless ways and pass them to an inmate unnoticed by even the most vigilant observers. And these items can readily be slipped from the clothing of an innocent child, or transferred by other visitors permitted close contact with inmates.

See also Goff v. Nix, 803 F.2d 358, 364-65 (8th Cir. 1986) ("The record in this case reflects what this Court and other courts know and long have acknowledged, namely that weapons, drugs, and other items of contraband are serious problems in our nation's prisons. The director of security at [the facility] testified that a substantial portion of the contraband at the prison is introduced through contact visitation.").

In this case, both Administrator Hannan and the county's expert witness, William Sturgeon, testified that contact visits are a significant source of contraband in jails, and that seemingly harmless items – such as pens and paper clips – can be transferred innocently and used in harmful ways. Paper clips, for example, can be used to jam and open handcuffs, pick locks, or poke someone. Hannon stated that she was aware of about a dozen occasions during her correctional career when a family member or friend had tried to deliver, or had delivered, contraband to an inmate during a contact visit. Although the Hancock County Jail had reported in response

-24-

to Sturgeon's inquiry no instances of contraband being found during a strip search, he – like the Supreme Court – observed that the low numbers may be attributable to the deterrent effect of strip search policies.

Viewed from the perspective of our precedent on strip-searching misdemeanor detainees, Bell's teaching is that the widely acknowledged risk posed by contact visits furnishes sufficient suspicion to justify a blanket policy. And, guided by Bell, other courts evaluating the constitutionality of strip searches, including our own, have noted the distinctive need to search that arises from contact visits. See, e.g., Roberts, 239 F.3d at 111 ("Courts have given prisons far more leeway in conducting searches of inmates with outside contact than in searching everyone, simply because such visits often allow smuggling of contraband."); id. at 113 ("Both the Supreme Court in Bell and this court in Arruda [v. Fair, 710 F.2d 886 (1st Cir. 1983)] have suggested that an individualized reasonable suspicion is not necessary to search certain groups of inmates, such as those who receive visitors . . . .");[16] Shain v. Ellison, 273 F.3d 56, 64 (2d Cir. 2001) (". . . Bell authorized strip searches after contact visits, where

_____

[16] We note that, in Miller v. Kennebec County, 219 F.3d 8, 12 (1st Cir. 2000), we did not distinguish between a strip search conducted as part of the intake process and two subsequent strip searches following the plaintiff's contact visits with family members. Nor did we analyze the rationale for strip searching inmates following contact visits. We therefore do not view Miller as helpful authority on that issue.

-25-

contraband often is passed."); <u>Michenfelder</u> v. <u>Sumner</u>, 860 F.2d 328, 332 (9th Cir. 1988) ("Visual body cavity searches conducted after contact visits as a means of preventing prisoners' possession of weapons and contraband, even absent probable cause, have been found reasonable by the Supreme Court.").

We thus read <u>Bell</u> to hold that, except in atypical circumstances, a blanket policy of strip searching inmates after contact visits is constitutional. The Court acknowledged that circumstances may occur to render such a search unreasonable – "on occasion a security guard may conduct the search in an abusive fashion" – and its opinion emphasizes that such treatment will not be tolerated. 441 U.S. at 560 ("The searches must be conducted in a reasonable manner.").

The challenged instruction accurately reflected this state of the law, advising the jury that strip searching appellant following contact visits was permissible unless "additional facts . . . make the application of a postcontact visit strip-searching policy unreasonable under the circumstances of this case." Appellant had the opportunity to argue that the search at issue here was unreasonable, and did so. Counsel's argument highlighted that the visitor with whom appellant had contact was his lawyer, an unlikely source of contraband. Counsel further urged jurors to consider that the jail's history showed an absence of contraband entering through contact visits, that the risks were low because minimum-

and maximum-security inmates were housed separately, that appellant was never offered the option of a non-contact visit, and that other alternatives were available for detecting contraband.

The jury, however, heard testimony that even professionals such as lawyers and counselors may innocently transfer items that seem innocuous but can be used as tools or weapons. The county also responded to appellant's other suggestions of unreasonableness; Sturgeon testified, for example, that the alternative of a "correctional pat search" would involve significant physical contact that inmates may view as more distasteful than a quick visual search. Appellant did not contend that the search procedure itself was unreasonable, and the record reveals no unusual elements. It was done in a private area, by a single officer of the same gender, and without physical contact.

Also unavailing is appellant's complaint that the jury's consideration of reasonableness was compromised because the court invited undue deference to jail administrators. In Bell, the Supreme Court explicitly stated that

> [p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.

441 U.S. at 547. The instruction largely mirrored this language.

To be sure, a more ideal charge could have been crafted. Rather than beginning with the presumption of constitutionality, we

think it would have been preferable for the court to start with the general balancing test articulated in <u>Bell</u> before going on to say that the Supreme Court has sanctioned strip searches following contact visits so long as they are reasonable. Likewise, to fully inform the jury on the nature of the "wide-ranging deference" due to jail administrators, we think an instruction specifically noting its limits would be helpful. Appellant's Requested Jury Instruction #12, drawn from our decision in <u>Roberts</u>, <u>see</u> 239 F.3d at 113, is one possible example: "A blanket strip search policy cannot be justified simply on the basis of administrative ease in addressing security considerations."

The instruction as given, however, adequately informed the jury of its task, and we therefore affirm the judgment for defendants on the post-contact strip search claim.

### III. <u>Conclusion</u>

The overly narrow definition of "strip search" contained in the jury instructions improperly limited the jury's deliberations on the nature of the May 27th and July 10th searches. Appellant is therefore entitled to a new trial on his claims of constitutional injury arising from those searches. The jury charge on the July 11th post-contact strip search accurately reflected the law, however, and we therefore affirm the jury's judgment that no constitutional injury occurred in connection with that search.

-28-

Affirmed in part, vacated in part, and remanded for a partial new trial. No costs.