**Dennis BRONER, Plaintiff,**

v.

**John M. FLYNN, Sheriff of Worcester County, and John Doe, and others, et. al., Defendants.**

**No. CIV.A. 01–40027–CBS.**

United States District Court,
D. Massachusetts.

March 31, 2004.

John W. Capone, Worcester, MA, for Dennis Broner, Plaintiff.

Michael A. Gray, Worcester County Sheriff's Office, West Boylston, MA, for John M. Flynn, John Doe, Defendants.

Robert J. Hennigan, Jr., Law Office of Robert J. Hennigan, Jr., Worcester, MA, for Dennis Broner, Plaintiff.

Edward F. O'Brien, Jr., Edward O'Brien, Falmouth, MA, for John Doe, John M. Flynn, Defendants.

### Memorandum Of Decision And Order For Judgment

SWARTWOOD, United States Magistrate Judge.

By voluntary consent of the parties, this case was referred to me for all further proceedings and entry of final judgment in accordance with 28 U.S.C. 636(c) and Fed. R.Civ.P. 73. This Order addresses:

I.  *Nature of the Proceedings*

1.  Defendants'[1] Motion for Summary Judgment (Docket No. 20); and

2.  Plaintiff's Motion for Leave to File Third Amended Complaint (Docket No. 24).

II.  *Nature of the Case*

Plaintiff, Dennis Broner ("Plaintiff" or "Mr. Broner"), brought this civil rights action under 42 U.S.C. § 1983 against John M. Flynn, the Sheriff of Worcester County ("Sheriff Flynn"), and unnamed employees of the Worcester County Jail and House of Corrections ("WCJHC") (collectively, "Defendants"), for violation of his Eighth and Fourteenth Amendment Rights as the result of injuries he sustained during an assault on another inmate.[2]

### The Defendants' Motion For Summary Judgment

#### Standard Of Review

Summary judgment is appropriate when the record indicates that "there is no genu-

---

1.  Because John M. Flynn is the only named Defendant in this suit, I will treat this case as involving a single defendant.

2.  At the hearing on this motion, this Court sua sponte raised the issue of whether Mr. Broner was required to exhaust administrative remedies with respect to his claims in accordance with 42 U.S.C. § 1997e(a). Because Section 1997a(e) is not jurisdictional and because the Defendant never raised this issue in his Answer or motion for summary judgment, I find that it would not be appropriate for this Court to address this issue at this time. *See Chelette v. Harris,* 229 F.3d 684 (8th Cir.2000).

ine issue of material fact, and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. In this context, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant, and, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point for the nonmoving party. *Suarez v. Pueblo Int'l, Inc.,* 229 F.3d 49, 53 (1st Cir.2000). Furthermore, summary judgment is properly entered against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Connell v. Bank of Boston,* 924 F.2d 1169, 1172 (1st Cir.1991). Finally, when considering a motion for summary judgment, courts "view the entire record in the light most favorable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Suarez,* 229 F.3d at 53.

### Facts [3]

1. On February 22, 1999, Mr. Broner and Tyrone Gardner ("Mr.Gardner") were inmates housed in adjacent cells (Nos. 218 and 219), on the second floor of the "I–Block" at the Worcester County Jail and House of Correction ("WCJHC").

2. On February 22, 1999, at approximately 10:35 a.m., WCJHC employee Marybeth Camosse ("Ms.Camosse") submitted a "Disciplinary/Investigation Report," which indicated that she had "received information from an unnamed source that inmate Tyrone Gardner was 'going to be jumped by the ÑETA gang [4] sometime today.' ". Ms. Camosse's report further stated that she had reported this information to Lieutenant Robert Caracciolo ("Lt.Caracciolo") and Captain Michael Greaney ("Capt.Greaney").

3. Shortly after lunch that day, Capt. Greaney, in the presence of Lt. Caracciolo and Ms. Camosse, informed Mr. Gardner of the information contained in Ms. Camosse's report, and offered to place Mr. Gardner in protective custody. Mr. Gardner, stating that he had no enemies, refused the offer. Capt. Greaney, believed that Mr. Gardner, who was a "big individual" and "pretty tough guy," "would [not] have any problems," taking care of himself if a fight occurred. Therefore, Capt. Greaney allowed Mr. Gardner to return to the his cell block in general population of I–Block.

4. On February 22, 1999, while Mr. Broner was performing his duties as an assistant librarian at the WCJHC library, he was informed by Mr. Gardner that Capt. Greaney had offered to place him in protective custody, but he had refused. Mr. Broner knew of a conflict between Mr. Gardner and ÑETA members regarding Mr. Gardner's refusal to comply with ÑETA's rules of shower etiquette (Mr. Gardner refused to wear a towel over his boxer shorts when exiting the shower). Specifically, one or two days prior to the

---

3. To the extent that the Plaintiff does not dispute any factual assertions made by the Defendant in the Statement of Material Facts, *see Defs' Mot. For Sum. J.* (Docket No. 20), I have adopted such factual assertions, essentially verbatim. To the extent that Plaintiff does dispute such factual assertions, I have, as required, stated such facts in a light most favorable to him.

4. ÑETA is gang which operates both within and outside the prison system. At the WCJHC, ÑETA appears to be primarily comprised of Hispanic inmates. Apparently, there had been problems at WCJHC between African American inmates and ÑETA members. Both Mr. Gardner and Mr. Broner are African Americans.

incident, Mr. Broner had overheard inmates who were members of ÑETA threatening to get Mr. Gardner. At this point in time, Mr. Broner had not had any personal encounters with any ÑETA members.

5. Mr. Broner did not report the threats against Mr. Gardner to prison officials, because he believed that guards working on his cell block had overheard the threats made against Mr. Gardner.

6. On the afternoon of February 22, 1999, at approximately 2:30 p.m., Mr. Broner returned to his cell (No. 218) on I-Block for the daily lock-down and head count. Mr. Gardner returned to his cell (No. 219) at about the same time.

7. After a guard shift-change was completed, at approximately 3:00 p.m., the doors to all of the cells on I-Block were opened. Shortly thereafter, Mr. Broner, who had remained in his cell to write a letter, heard a scuffling noise. The noise, which sounded like a foot locker being thrown around, was coming from Mr. Gardner's cell.

8. Mr. Broner then observed Correctional Officer Darrien Brousseau ("Officer Brousseau"), who was on the first floor of cell Block–I when the disturbance began, come up the stairs, in an apparent attempt to investigate the noise coming from Mr. Gardner's cell. As Officer Brousseau approached Mr. Gardner's cell (he had passed Mr. Broner's cell), Mr. Broner stepped outside of his cell to observe the nature of the disturbance. Mr. Broner remained directly outside of his own cell.

9. As Officer Brousseau approached, four to five inmates exited Mr. Gardner's cell, all of whom were known members of ÑETA. Mr. Broner observed Mr. Gardner in the doorway of his cell facing Officer Brousseau. Officer Brousseau remained outside Mr. Gardner's cell and repeatedly asked him what had happened. Mr. Broner observed that Mr.

Gardner had bloodstains on his shirt and appeared to be in pain.

10. Mr. Broner observed Officer Brousseau radio for assistance. *Pl's Mem. In Opp. Of Defs' Mot. For Sum. J.* (Docket No. 21) ("*Pl's Opp.*"), *Ex. 3* (Affidavit of Dennis Broner) ("*Broner Aff.*"), at ¶ 15. Immediately thereafter, Mr. Gardner exited his cell and began to head down the stairs leading to the first floor of I–Block.

11. Officer Brousseau followed Mr. Gardner towards the stairs. As soon as Mr. Gardner began descending the stairs, approximately ten ÑETA members rushed across the top tier of I–Block toward the top of the stairs, where Mr. Broner was standing, apparently in pursuit of Mr. Gardner.

12. Mr. Broner was then pushed down the flight of stairs by the rush of ÑETA gang members. Mr. Broner observed that Officer Brousseau and Mr. Gardner had not yet reached the first floor when their pursuers began coming down the stairs. When Mr. Gardner did reach the first floor, he proceeded to one of the cells in the lower section of I–Block to confront one of the men who had assaulted him in his cell.

13. Officer Brousseau followed Mr. Gardner into the lower level cell. Mr. Broner then saw approximately fifteen ÑETA members assault Mr. Gardner and Officer Brousseau, who was attempting to protect Mr. Gardner by shielding him with his body.

14. In the ensuing melee, one of the inmates struck Officer Brousseau on the back with a heavy metal-based chair. The same inmate then made threatening gestures with the chair towards Mr. Broner, who was now standing near the bottom of the staircase, and Officer Brousseau, who was heading toward the staircase. As the inmate wielding the chair approached, Mr.

Broner seized the base of the chair and forced the inmate to throw it to the ground. Another inmate then picked up and threw the chair out of the reach of the fighting inmates.

15. By this time, Mr. Gardner had locked himself inside one of the cells on the lower level.

16. As corrections officers responding to the melee were proceeding down the staircase to the lower level of I–Block, they observed a widespread altercation with inmates assaulting each other with a variety of weapons, including cribbage boards, socks filled with hard objects, homemade shanks and knives. Lieutenant Bruce Darcy ("Lt.Darcy"), ordered all responding officers to return to the control booth. All officers immediately went up the stairs into the control booth and secured it.

17. Mr. Brousseau ran up the stairs into the control booth. Lt. Darcy held the door to the booth open for him.

18. At no point during this episode did any corrections officers enter I–Block to assist either Mr. Broner or Officer Brousseau. Mr. Broner heard corrections officers at the main entrance to I–Block banging on the door to enter the cellblock (the "sallyport"). In fact, as many as five corrections officers were waiting for the sallyport doors to be opened. However, because the fight had spread to the sallyport area, Sergeant Fuller ("Sgt.Fuller") determined not to open the sallyport doors for fear that the officers would be ambushed. The sallyport doors were not opened until the fight concluded several minutes later, after the inmates had re-entered their cells in response to an order which came over the intercom.[5]

19. Mr. Broner was assaulted by twenty-five to thirty-five inmates. He was punched, kicked, and beaten with various objects, including a can of shaving cream, a cribbage board, a broken table leg, and a sock filled with batteries. He also was stabbed by homemade knives.

20. Sgt. Fuller, Lt. Darcy, Officer Matthew Fiore ("Officer Fiore"), Officer Ruben Guadalupe ("Officer Guadalupe"), Officer Justin LaMonda ("Officer Lamonda"), Officer Keith Taparausky ("Officer Taparausky"), and Officer Stephen Viner ("Officer Viner") remained in the control booth through this time period, watching the assault of Mr. Broner.

21. When the corrections officers did enter the lower cell level, Mr. Broner was immediately attended to by an institutional nurse and brought to St. Vincent's Hospital for treatment of his wounds. He returned to WCJHC from St. Vincent's Hospital at 8:50 p.m. on the evening of February 22, 1999, and was placed on medical watch.

5. Mr. Broner asserts that there is a genuine issue of material fact as to why Sgt. Fuller did not open the doors to the sallyport. I disagree. In his deposition testimony (which was cited by the Defendants), Sgt. Fuller testified that he did not open the sallyport doors because he feared that because the fight was taking place in front of those doors, the responding officers would be ambushed. The deposition testimony cited by Mr. Broner (pages 12 and 13 of Sgt. Fuller's deposition) in support of his contention that this factual assertion is in dispute is irrelevant to this issue and for that reason, cannot create a genuine issue of material fact. Mr. Broner also seeks to create a genuine issue of material fact as to this issue by pointing out that in a prior incident involving a similar scale fight among inmates, Sgt. Fuller and other corrections officers responded by going into the block to break up the fight. What Sgt. Fuller may have done in a prior situation does not create a genuine issue of material fact where there is uncontradicted evidence of what Sgt. Fuller did and why he did it during the course of the incident underlying Mr. Broner's claims.

22. The corrections officers who were on duty on the I–Block on the 3:00 p.m. to 11:00 p.m. shift on the day of the incident had not been made aware of the fact that a threat had been made against Mr. Gardner by a well established gang. One of the corrections officers originally scheduled to work the I–Block during that shift was transferred to cover the J–Block.

## Discussion

Mr. Broner has alleged Section 1983 claims against Sheriff Flynn, as supervisor of the WCJHC, in both his individual and official capacity. Initially, I will address Mr. Broner's claims against Sheriff Flynn in his official capacity. I will then address whether summary judgment is warranted on Mr. Broner's claims against Sheriff Flynn in his individual capacity.

### Claims Against Sheriff Flynn
### In His Official Capacity

■ Effective July 1, 1998, the government of Worcester County was abolished. Effective September 1, 1998, the Sheriff of Worcester County, who was then and continues to be, John M. Flynn, became an officer and employee of the Commonwealth of Massachusetts and all of the "functions, duties and responsibilities for the operation and management of" the WCJHC were transferred to the Commonwealth. Mass. Gen. Laws ch. 34(B), §§ 1, 12 (2004). Therefore, a Section 1983 suit against Sheriff Flynn in his official capacity is deemed to be a suit against the Commonwealth. Since a state is not a "person" for purposes of Section 1983, all claims against Sheriff Flynn in his official capacity are barred. *Forte v. Sullivan,* 935 F.2d 1, 2 n. 2 (1st Cir.1991) (state is not person for Section 1983 purposes and claim against state official in his/her official capacity is suit against state, which is barred). Therefore, summary judgment shall enter for Sheriff Flynn with respect

to Mr. Broner's Section 1983 claims against him in his official capacity.

■ At the hearing on this motion, counsel for Mr. Broner suggested that the Commonwealth may have waived its sovereign immunity defense by raising it for the first time in its motion for summary judgment. I disagree. First, by operation of law, Sheriff Flynn became an employee of the Commonwealth and the WCJHC fell under the auspices of the state over two and half years before this suit was filed. In the Answer to the original and Second Amended Complaints, Sheriff Flynn indicated that he is an employee of the Commonwealth and thus, entitled to "qualified immunity" with respect to claims against him in his official capacity. The suggestion, made at the hearing, that counsel for Mr. Broner learned for the first time in Sheriff Flynn's motion for summary judgment that he is a state employee and that the WCJHC is an arm of the state is disingenuous. The inadvertent reference to "qualified" as opposed to "sovereign" immunity in Sheriff Flynn's pleadings did not result in any unfair surprise or prejudice to Mr. Broner. Second, even if I were to find that the Commonwealth had waived its sovereign immunity defense, there is not a scintilla of evidence in the record that any custom, policy or practice which can be attributed to the Commonwealth (through Sheriff Flynn or any other policy maker) led to a deprivation of Mr. Broner's constitutional rights. *See Wood v. Hancock County Sheriff's Dep't,* 354 F.3d 57, 64 (1st Cir.2003) (governmental entity may not be held liable under Section 1983 for employee's constitutional violations unless plaintiff's injury results from policy, custom or practice so widespread and well settled, that policy making officials can be said to have actual or constructive knowledge of practice). For this additional reason, summary judgment is

warranted with respect to Mr. Broner's claims against Sheriff Flynn in his official capacity.

### Claims Against Sheriff Flynn In His Individual Capacity [6]

■ "The Eighth Amendment to the Constitution protects convicted inmates from the imposition of 'cruel and unusual punishments.' An inmate may sue a correctional facility under the Eighth Amendment for failure to afford adequate protection to inmates from attack by other inmates." *Calderon–Ortiz v. Laboy–Alvarado*, 300 F.3d 60, 63–64 (1st Cir. 2002). Thus, prison officials have a duty to "take reasonable measures to guarantee inmates' safety from attacks by other inmates." *Id.*, at 64.

■ In order to establish an Eighth Amendment claim against prison officials for injuries sustained in an attack by another inmate, a prisoner must show: (1) "that the deprivation alleged is 'objectively, sufficiently serious' "; and (2) the prison official knew of a substantial risk of serious harm to the prisoner, and disregarded such risk. *Id.* (citing *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994)). While the second prong is a subjective test, it is not necessary for the prisoner to show that the prison official knew "that a specific harm would befall the inmate." Rather, it is sufficient for the plaintiff to establish that there existed "knowledge of facts from which the official can draw the inference that a substantial risk of serious harm exists. The question of whether a prison official had the required knowledge of a substantial risk is a 'question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious' ". *Id.*, at 65 (citation to quoted case and internal citations omitted).

■ When a plaintiff asserts claims against an individual in his supervisory capacity, liability cannot be established on a basis of *respondeat superior*. Rather, "[a] supervisor may be found liable only on the basis of his own acts or omissions. Moreover, a supervisor cannot be liable for merely negligent acts. Rather, a supervisor's acts or omissions must amount to a reckless or callous indifference to the constitutional rights of others." *Febus–Rodriguez v. Betancourt–Lebron*, 14 F.3d 87, 91–92 (1st Cir.1994) (internal citations omitted).

■ Mr. Broner has not alleged *any facts* which would support a finding that any acts or omissions by Sheriff Flynn amounted to a reckless or callous indifference to his constitutional rights. On the contrary, Mr. Broner appears to be arguing that on the day in question, various corrections officers took° actions which were against WCJHC policy, or that vio-

---

**6.** Plaintiff's opposition to the motion for summary judgment essentially seeks to amend the complaint to name the John Doe Defendants and "to substitute Sheriff John J. [sic] Flynn." The opposition does not contain any meaningful argument that summary judgment should not enter in favor of Sheriff Flynn. Rather, the opposition essentially argues that summary judgment should not enter in favor of various corrections officers who, as of yet, are not even parties to this litigation. Plaintiff was advised at the hearing on the motion for summary judgment that he would be required to file a motion to amend if he desired to substitute named defendants for the "John Does." Plaintiff's proposed third amended complaint does not name Sheriff Flynn as a defendant. Although at the hearing, counsel for Mr. Broner acknowledged that there is little evidence to support a section 1983 claim against Sheriff Flynn in his individual capacity, he would not concede that summary judgment should enter in Sheriff Flynn's favor.

lated past practices whereby WCJHC officers took reasonable steps to protect inmates during large scale altercations. Mr. Broner has failed to affirmatively link any such alleged conduct by WCJHC corrections officers to any act, omission or policy of Sheriff Flynn. Under these circumstances, Sheriff Flynn's motion for summary judgment is allowed as to Mr. Broner's Section 1983 claims against Sheriff Flynn in his individual capacity.

### Motion for Leave to File a Third Amended Complaint [7]

On January 13, 2003, Plaintiff filed his motion for leave to file a third amended complaint naming Correctional Officers Fiore, Guadalupe, LaMonda, Taparausky, Viner, and Lt. Darcy, Sgt. Fuller, and Capt. Greaney, as Defendants in place of "John Doe and others, et al." Mr. Broner faces at least two major hurdles in seeking to amend his complaint at this late stage in the proceedings. First, Mr. Broner filed this motion well after discovery had been completed and after the only named Defendant in this action, Sheriff Flynn, had filed a motion for summary judgment. While in general leave to amend is freely given, where " 'leave to amend is not sought until after discovery has closed and a summary judgment motion has been docketed, the proposed amendment must be not only theoretically

viable but also solidly grounded in the record [and] . . . supported by substantial evidence' ". *Watson v. Deaconess Waltham Hosp.*, 298 F.3d 102, 109 (1st Cir. 2002) (citation to quoted case omitted). Second, the three year statute of limitations applicable to Mr. Broner's claims against these John Doe Defendants expired nearly eleventh months before he filed his motion to amend.[8] Therefore, Mr. Broner must establish that the relation back provisions of Fed.R.Civ.P. 15(c) apply in this case and if so, that he has satisfied the requirements of Rule 15(c).

### Facts Relevant To Mr. Broner's Motion To Amend

1. On February 21, 2001, Mr. Broner filed his original complaint naming as Defendants: "John M. Flynn, Sheriff of Worcester County, and John Doe, and others, et al." *Complaint* (Docket No. 1).

2. On July 25, 2001, Mr. Broner's original counsel withdrew and was succeeded by Mr. Broner's present counsel. *See* Notice of Withdrawal (Docket No. 4) and Notice of Appearance (Docket No. 5).

3. On September 25, 2001, this Court, Gorton, D.J., issued a Scheduling Order (Docket No. 12), which required that all amendments and/or supplements to pleadings be filed by February 28, 2002 and that

---

7. Mr. Broner's initial complaint, filed on February 2, 2001, named Sheriff Flynn and "John Doe, et al." as Defendants. A first amended complaint was not filed or docketed due to an error in the pleading. Mr. Broner's initial counsel withdrew and was replaced by present counsel on July 30, 2001. A second amended complaint, again naming Sheriff Flynn and "John Doe, et al." as Defendants, was filed on March 6, 2002.

8. A Section 1983 claim borrows the most analogous statue of limitations of the state whose law governs the claim. 42 U.S.C. § 1988. In Massachusetts, the statute of limi-

tations period applicable to personal injury tort claims, and therefore, Section 1983 claims involving personal injury, is three years. *See Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir.2003); Mass. Gen. Laws ch. 260, § 2A. The filing of a complaint against a "John Doe" defendant does not toll the running of the statute of limitations as to the individual ultimately identified as such defendant. *See Garvin v. City of Philadelphia*, 354 F.3d 215, 220 (3rd Cir.2003). Therefore, the statute of limitations for Mr. Broner's Section 1983 claims against the proposed additional Defendants expired on February 22, 2002.

all discovery (excluding expert depositions) be completed by August 31, 2002.

4. On March 6, 2002, with the assent of Sheriff Flynn, Mr. Broner filed a Second Amended Complaint (Docket No. 14) which again named as Defendants: "John M. Flynn, Sheriff of Worcester County, and John Doe, and others, et al."

5. On December 4, 2002, Mr. Broner filed an opposition to Sheriff Flynn's motion for summary judgment in which, by way of a footnote, he requested that he be allowed to amend his complaint to identify those Defendants referred to as "John Doe, et al." in his original and Second Amended Complaints.

6. On January 13, 2003, Mr. Broner filed his motion to file a third amended complaint.

### Discussion

Where a plaintiff seeks to amend his complaint to add new parties against whom the statute of limitations has run, he must establish that the relation back requirements of Fed.R.Civ.P. 15(c) are met. In this case, Mr. Broner seeks to further amend his Complaint to name individuals whose identities were unknown to him at the time he filed his original and Second Amended Complaints and therefore, were referred to as "John Doe, et al" in those pleadings. Before addressing Mr. Broner's argument that he has satisfied the requirements of Rule 15(c), this Court must first determine whether Rule 15(c) applies under the circumstances of this case. There is a split of authority among the circuit courts of appeal as to whether Rule 15(c) applies where a plaintiff seeks to amend a complaint to identify individuals against whom the plaintiff desired to file cause of action, but whose identity was unknown at the time of the filing of the original pleading.

In *Wilson v. United States,* 23 F.3d 559 (1st Cir.1994), the First Circuit stated that Rule 15(c) was not intended to apply where the plaintiff "merely lacked knowledge of the proper party," rather it is intended to apply where there has been a mistake concerning the identity of the proper party. *Id.,* at 563. Numerous circuit courts of appeal have cited *Wilson* for the proposition that the First Circuit has held that Rule 15(c) does not apply where the plaintiff seeks to identify "John Doe" defendants after the statute of limitations has run. In *McIntosh v. Antonino,* 71 F.3d 29 (1st Cir.1995), the First Circuit, in *dicta,* citing *Barrow v. Wethersfield Police Dep't,* 66 F.3d 466, as modified in 74 F.3d 1366 (2d Cir.1995) (15(c) cannot be used to add named defendants to suit in place of John Doe defendants after expiration of statute of limitations), suggested that the plaintiff could not amend its complaint to substitute named defendants for John Doe defendants.

However, in *Leonard v. Parry,* 219 F.3d 25 (1st Cir.2000), the First Circuit stated that:

> *Wilson* is not a case in which a plaintiff intended to sue A and sued B by reason of a mistake concerning identity. Rather it is a case in which the plaintiff chose the wrong theory of liability ... and sued the wrong party... Rule 15(c)(3) was not designed to remedy a mistake in the selection of a legal theory.

*Id.,* at 31 (internal citation and footnote omitted). Given this more recent interpretation of *Wilson,* it is not at all clear that the First Circuit intended to infer in that case that the relation back provisions of Rule 15(c) do not apply where the plaintiff seeks to identify "John Doe" defendants after the statute of limitations has run.

Although the First Circuit has not expressly addressed this issue, eight of the nine circuits that have done so have held that "as a matter of law, a plaintiff's lack of knowledge of the intended defendant's

identity is not a 'mistake concerning the identify of the proper party' within the meaning of Rule 15(c)(3)... A plaintiff's designation of an unknown defendant as 'John Doe' in the original complaint is not a formal defect of the type Rule 15(c)(3) was meant to address." *Garrett v. Fleming*, 362 F.3d 692 (10th Cir. 2004) (internal citations and citation to quoted case omitted); *see also* cases cited therein.

It is unclear whether the First Circuit, if squarely faced with the issue, would find that Rule 15(c)'s relation back provisions do not apply where a plaintiff seeks to amend a complaint to identify "John Doe" defendants. However, given the overwhelming number of circuit courts of appeal that have so held, this Court is constrained to find that Rule 15(c) does not apply in such cases. Since the relation back provisions of Rule 15(c) do not apply in this case, Mr. Broner's claims against the corrections officers he seeks to add by way of his Third Amended Complaint are barred by the applicable statute of limitations. Therefore, to allow such amendment would be futile. Under these circumstances, it is not necessary for me to address whether Mr. Broner has met the Rule 15(c) requirements, or whether his amended complaint is theoretically viable, solidly grounded in the record and supported by substantial evidence.

For the reasons stated above, Mr. Broner's motion to filed a Third Amended Complaint is denied.[9]

*Conclusion*

It is ordered that:

1. Defendants' Motion for Summary Judgment (Docket No. 20) is *allowed;* and

2. Plaintiff's Motion for Leave to File Third Amended Complaint (Docket No. 24) is *denied.*

Judgment shall enter for the Defendants.

---

9. This may seem a harsh result, particularly since it appears that Mr. Broner may not have discovered the names of the corrections officers he seeks to add as parties by way of his

Third Amended Complaint until after the statute of limitations had expired. Nonetheless, it is the result compelled by this Court's rules of procedure.