Ramon M. **SUAREZ**, et al.,
**Plaintiffs, Appellants,**

v.

**PUEBLO INTERNATIONAL, INC.,**
et al., **Defendants, Appellees.**

No. 99–2307.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 2000.

Decided Oct. 11, 2000.

Víctor Miranda Corrada, with whom Harry Anduze Montaño was on brief, for appellants.

Lidia González, with whom Annette Nogueras and Muñoz Boneta González Arbona Benitez & Peral were on brief, for appellees.

Before SELYA, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

SELYA, Circuit Judge.

This appeal rises, Phoenix-like, from the ashes of an age discrimination claim—but unlike many employment discrimination cases that are consumed by the summary judgment flames, it does not necessitate an exploration of the interstices of the complex burden-shifting framework commonly associated with such matters. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) (crafting that framework for use in discrimination cases); *Mesnick v. General Elec. Co.,* 950 F.2d 816, 823–24 (1st Cir.1991) (extending this model to age discrimination cases). Resolving the appeal does, however, require us to contrast the sort of changes in working conditions that may work a constructive discharge with those that lead to nothing more than unpleasantness, hurt feelings, and wounded pride. In the end, we affirm the district court's entry of summary judgment in the employer's favor.

## I. BACKGROUND

Following conventional summary judgment praxis, *see, e.g., McCarthy v. Northwest Airlines, Inc.,* 56 F.3d 313, 315 (1st Cir.1995), we limn the facts in the light most congenial to the party opposing the motion for *brevis* disposition (in this case, the former employee).

Plaintiff-appellant Ramón M. Suárez was born in 1937. At age fifty-two, he became president of CaribAd, Inc., an advertising firm with offices in Hato Rey. CaribAd was a wholly-owned subsidiary of Pueblo International, Inc. (Pueblo). Pueblo's core business involved the operation of supermarkets, and CaribAd provided advertising services to Pueblo and its various divisions and affiliates (as well as to unrelated enterprises) in Puerto Rico.

The appellant's work situation began to deteriorate in 1996 when his immediate superior, William T. Keon III (Pueblo's president and chairman of CaribAd's board of directors), decided to restructure Pueblo's Puerto Rican operations to stem mounting losses. Keon consulted with the chief executives of CaribAd's two largest in-house clients, namely, Edwin Pérez (who ran Pueblo's supermarket operations in Puerto Rico) and Filiberto Berríos (the president of Pueblo's "Blockbuster" division). Pérez and Berríos both criticized the quality of CaribAd's work product. In response, Keon wrote to the appellant on March 28, 1996, directing him to hire new creative talent. Expressing satisfaction with his existing staff, the appellant resisted.

At that juncture, Keon took the bull by the horns and decided to transfer most of CaribAd's employees from Hato Rey to Pueblo's corporate headquarters in Carolina.[1] Although Keon assured the appellant that he (Suárez) would remain in charge of all CaribAd activities and personnel, Keon emphasized that the appellant's principal responsibility henceforth would be the development of "third-party" business (i.e., business generated outside of Pueblo's corporate family). To facilitate this plan, Suárez and a receptionist would continue to occupy a free-standing office suite in Hato Rey, as well as having an office at Pueblo's facility in Carolina.[2]

From the appellant's viewpoint, the relocation came as a blow. His discomfiture increased when Keon, referring to the need to attract third-party business, told him that he would have to "sing and dance alone." He also took umbrage at Keon's statement to the effect that he would have to knock on doors like a traveling salesman. Finally, in what the appellant thought was an arbitrary and unreasonable demand, Keon ordered him to complete a three-page relocation report overnight.

Feeling isolated and deposed, the appellant developed a depressive illness. This culminated in a collapse, forcing him to take sick leave in June of 1996. The appellant's physicians advised him not to resume his duties in the near future, and he transmitted his doctors' notes to Keon. Keon sent flowers and a "get well" card, and repeatedly expressed his hope that the appellant would return to work as soon as possible.

That hope never materialized. After exhausting his sick leave in July 1996, the appellant requested an additional five or six weeks of paid vacation. Keon refused to grant this request and again beseeched the appellant to return to his desk. The appellant refused to do so and remained absent from work for several more months. During that period, he failed to respond to Keon's repeated efforts to contact him.

Professing exasperation, Keon terminated the appellant's employment on December 4, 1996. Five days later, an "outside" advertising executive, Aníbal García, began work as CaribAd's "new business" manager. Some months thereafter, García became the firm's chief executive officer.

Asserting the existence of an elaborate, age-based plot designed to render him obsolete, the appellant filed suit against Pueblo, CaribAd, Keon, and Pérez.[3] His complaint (which sought both compensatory damages and equitable relief) contained counts under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (ADEA), and various provisions of Puerto Rico law. However, it advanced no claims of disability discrimination or refusal to accommodate the sequelae of the appellant's collapse.

In due course, the district court declared itself unable to discern any proof of an adverse employment action and entered summary judgment for the defendants on the ADEA claim. The court simultaneously dismissed the supplemental claims without prejudice. This appeal ensued.

1. Both Hato Rey and Carolina are within the San Juan metropolitan area.

2. The appellant speculates that no such second office would have been made available, but he cites no competent evidence to support his speculation, and, thus, he fails to create a genuine issue of material fact for summary judgment purposes. *See, e.g., Garside v. Osco Drug, Inc.*, 895 F.2d 46, 49–50 (1st Cir.1990). At any rate, even if Keon's plan called for the appellant to have one office rather than two, the outcome of this appeal would be the same.

3. The appellant's wife and their conjugal partnership joined in the complaint. Since their claims are purely derivative, we refer to the appellant, for simplicity's sake, as if he were the sole plaintiff and appellant. Withal, our holding applies equally to all plaintiffs.

## II. THE SUMMARY JUDGMENT STANDARD

We review orders granting summary judgment de novo. *See Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48 (1st Cir.1990). In *McCarthy*, we delineated the manner in which the operative rule, Federal Rule of Civil Procedure 56, functions:

> Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. Not every factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. By like token, "genuine" means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party.

56 F.3d at 315 (citations and some internal punctuation marks omitted).

■ To make this assessment in a given case, we "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." *Griggs–Ryan v. Smith*, 904 F.2d 112, 115 (1st Cir.1990). When carrying out that task, we safely can ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). If no genuine issue of material fact emerges from this perscrutation, then the case may be ripe for summary adjudication.

## III. ANALYSIS

■ The ADEA makes it illegal for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). Where, as here, an employee lacks direct evidence that the employer's actions were motivated by age animus, the *McDonnell Douglas* burden-shifting framework dictates the progression of proof. *See Mesnick*, 950 F.2d at 823.

■ The first step in this progression involves the employee's prima facie case. To climb this step, an employee suing under the ADEA for termination of employment must adduce evidence which, if believed, suffices to prove four facts: (1) that he was at least forty years old when he and his employer parted company; (2) that his job performance met the employer's legitimate expectations; (3) that he lost his position through an adverse employment action attributable to the employer (typically, a firing); and (4) that the employer had a continuing need for the services that he had been rendering. *See, e.g., id.; Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir.1988); *Menzel v. Western Auto Supply Co.*, 848 F.2d 327, 328 (1st Cir.1988).[4] In this instance, the first

---

4. The fourth prong of the test differs slightly in cases stemming from reductions in force. In such situations, this prong may be satisfied by a showing that the employer, in the course of downsizing, did not treat age neutrally. *See, e.g., Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir.1995); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 842 (1st Cir. 1993); *Vega v. Kodak Caribbean, Ltd.*, 3 F.3d 476, 479 (1st Cir.1993). Our decision in *Alvarez–Fonseca v. Pepsi Cola Bottling Co.*, 152 F.3d 17, 24 (1st Cir.1998), *cert. denied*, 526 U.S. 1123, 119 S.Ct. 1778, 143 L.Ed.2d 806 (1999), blurs this distinction. There, however, nothing turned on the fourth prong, and we regard any apparent departure from settled authority as inadvertent dictum (and, therefore, of no force).

and fourth requirements are not in issue: the appellant was nearing sixty years of age in 1996, and others (first Keon and then García) continued to oversee CaribAd's activities after he departed. So too the second requirement: the appellant functioned adequately as CaribAd's president for several years, and the defendants, though critical of certain aspects of his performance, do not claim for summary judgment purposes that he lacked the necessary skills to do his job. Thus, the focus here is on the third of the four prongs.

■ The district court found that the appellant had failed to show that he had been cashiered or, indeed, that his employer had taken any adverse employment action against him. The appellant attempts to fill this hole in his proof by asserting that he was constructively discharged. The summary judgment record fails to substantiate this assertion.

■ We do not fault the appellant's legal theory. An employer cannot accomplish by indirection what the law prohibits it from doing directly. Just as the ADEA bars an employer from dismissing an employee because of his age, so too it bars an employer from engaging in a calculated, age-inspired effort to force an employee to quit. Accordingly, a constructive discharge can ground an employment discrimination claim. *See, e.g., Ramos v. Davis & Geck, Inc.,* 167 F.3d 727, 731–33 (1st Cir.1999); *Hebert v. Mohawk Rubber Co.,* 872 F.2d 1104, 1113 (1st Cir.1989); *Calhoun v. Acme Cleveland Corp.,* 798 F.2d 559, 563–64 (1st Cir.1986). The question, then, is whether the record, analyzed in the light most flattering to the appellant's theory of the case, contains evidence from which a reasonable trier could find that his employer constructively discharged him.

■ To take the measure of a claim of constructive discharge, an inquiring court must gauge whether the working conditions imposed by the employer had become so onerous, abusive, or unpleasant that a reasonable person in the employee's position would have felt compelled to resign. *See Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 480 (1st Cir.1993). This standard cannot be triggered solely by an employee's subjective beliefs, no matter how sincerely held. *See id.* at 481; *Calhoun,* 798 F.2d at 561. The ultimate test is one of objective reasonableness. *See Serrano–Cruz v. DFI P.R., Inc.,* 109 F.3d 23, 26 (1st Cir.1997); *Vega,* 3 F.3d at 481. The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins—thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world. Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics. *See Calhoun,* 798 F.2d at 561.

In this case, the facts on which the claim of constructive discharge rests—e.g., Keon's dissatisfaction with CaribAd's work product, his decision to reconfigure the agency's operations, and his statements to the appellant—are largely undisputed. Taking those facts at face value (and giving genuinely disputed facts, to the extent material, the appellant's spin), we cannot say that what transpired would have caused a *reasonable* employee in the same or similar circumstances to throw up his hands and leave. Although we believe that this conclusion is self-explanatory given our statement of the relevant events, *see supra* Part I, we comment briefly on three aspects of the case that the appellant insists make a dispositive difference.

■ First, the appellant claims that the *defendants made his working conditions intolerable* by pushing him too hard. The poster child for this claim is his lament that Keon forced him to work overtime to complete a relocation report. The facts anent this incident are not in controversy: on the evening of May 29, 1996, Keon demanded that the appellant complete a three-page report by the following morning. This, at worst, was petty tyran-

ny. Standing alone, it falls well short of the showing required for constructive discharge. After all, the appellant was a highly-compensated executive, earning upwards of $190,000 per year. In that rarefied financial atmosphere, executives routinely are expected to work long hours and perform under pressure. An increase in work requirements that does not surpass reasonable expectations will not suffice to sustain a claim of constructive discharge. *See Greenberg v. Union Camp Corp.*, 48 F.3d 22, 27–28 (1st Cir.1995) (holding that requiring an employee to spend two additional days a week making sales calls was insufficient to support a claim of constructive discharge). A single incident of the sort described in this record fits neatly within the compass of this rule.

The appellant next complains that the defendants demeaned him and undermined his effectiveness by excluding him from operational meetings, relocating his staff, and relegating him to developing third-party clients. But these grievances cannot be wrenched from their contextual moorings. Under the former Pueblo regime, all senior management personnel attended weekly operational meetings. In May 1996, Keon modified this format to promote efficiency and suit his own travel schedule. Under the new paradigm, only five top executives—Keon himself, Berríos, Pérez, Freimark (Pueblo's chief financial officer), and Silverman (a senior vice-president)—regularly attended the weekly meetings. Several executives were dropped entirely from the roster of participants. At least seven others—the appellant, Pueblo's general counsel, the vice-presidents in charge of sales, construction, and human resources, and the directors of real estate and grocery activities—thereafter attended only those portions of the weekly meetings that required their input.

The record makes manifest that these changes were administered even-handedly. That is, the new configuration affected the appellant in precisely the same way as it affected at least six other similarly situat-ed members of the senior management team (all of whom were younger than he). Although the appellant attempts to contradict these facts, he does so without adducing any competent evidence to the contrary. We must, therefore, accept the facts as they appear in the summary judgment record. *See Garside*, 895 F.2d at 49–50.

The same holds true in respect to the facts concerning the relocation of personnel. To be sure, virtually all of CaribAd's staff was moved to Carolina. But despite this shift, the chain of command was not altered and the appellant remained in charge. In the last analysis, there is simply no evidence to suggest that the mass transfers were designed to punish the appellant or to force him into early retirement.

In all events, even assuming that the changes of which the appellant complains betokened an effort on Keon's part to marginalize him, this sort of injury to an employee's ego or prestige does not furnish a legally cognizable reason to treat a resignation as a constructive discharge. *See Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 120 (1st Cir.1977). "A more drastic reduction in the quality of working conditions is needed." *Id.* Indeed, corporations could not operate in the modern economy if the perquisites of every executive's job were frozen in time. The bottom line is simply this: a reduction in responsibility or a change in the way that business is done, unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge. *See Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 135–36 (7th Cir.1993) (holding that a mere change in job responsibilities without a concomitant loss of salary or benefits was not an adverse employment action under the ADEA).

Here, the key to the inquiry is whether the appellant still retained duties and emoluments appropriate to his rank. *See id.* We believe that ＿ ᐟid. While some

aspects of his working conditions had been revised, those alterations were relatively modest. The appellant's salary, benefits, and job title stayed the same. Importantly, his remaining duties (including the solicitation of new business) were appropriate to his station. Accordingly, the changes to which the appellant alludes, viewed objectively, did not furnish, singly or in combination, a sufficient foundation for his claim. We therefore conclude, as a matter of law, that no constructive discharge occurred.

In a last-ditch effort to turn the tide, the appellant urges us to assay his predicament in light of certain remarks about his age. To this end, he mentions that Keon told him that some of his proposals were "tired" and mused that another employee "looked old." He adds that Pérez stated in a press conference when he first arrived that Pueblo needed "new blood." These statements, the appellant tells us, poisoned the air and justified his decision not to resume his post.

■ That contention calls for red meat and strong drink, but the appellant offers only the most bland proof to support it. We do not doubt that, under some circumstances, comments relating to an employee's age can contribute to the creation of an intolerable work environment (and thus support a claim of constructive discharge). *See, e.g., Ramos,* 167 F.3d at 730–31. Here, however, the remarks attributed to Keon and Pérez are not only profoundly ambiguous, but also much too innocuous to transform routine managerial decisions into something more invidious.[5] Although these comments may well have struck the

appellant, subjectively, as mean-spirited and hurtful, a reasonable employee in his position would not have treated them as leaving him no real choice but to resign. *See Calhoun,* 798 F.2d at 561 (explaining that employees may not be unreasonably sensitive to their working environment).

## IV. CONCLUSION

We need go no further. While the appellant is a sympathetic figure, the record, read in the requisite light, fails to show a constructive discharge or other adverse employment action. It follows inexorably that the appellant has not made out a prima facie case of age discrimination.[6] Thus, the lower court appropriately granted summary judgment.

*Affirmed.*

5. The appellant adds that Berríos told his wife at a cocktail party some months earlier that he (the appellant) was an old man who should dye his hair and retire. Berríos, however, was not a decisionmaker, and this stray remark, uttered in a social setting, could not reasonably have created so noxious an atmosphere as to lead a reasonable executive to quit. *Cf. Laurin v. Providence Hosp.,* 150 F.3d 52, 58 (1st Cir.1998) (explaining that statements that are neither aligned to the decisional process nor close in time to an alleged

constructive discharge cannot be used to show discriminatory animus).

6. We take no view on whether the appellant's ADEA claims against Keon and Pérez would be actionable had there been an adverse employment action. *Compare, e.g., Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510–11 (4th Cir.1994) (holding that individual supervisors are not liable for ADEA violations) *with, e.g., Lettich v. Kenway,* 590 F.Supp. 1225, 1227 (D.Mass.1984) (holding contra).