Carlos **FONTANEZ NUÑEZ,**
et al., **Plaintiffs,**

v.

**JANSSEN ORTHO, LLC,**
et al., **Defendants**

No. CIV. 03–1069 JP.

United States District Court,
D. Puerto Rico.

March 18, 2005.

Nicolás Nogueras–Cartagena, Esq., San Juan, for Plaintiff.

María L. Santiago–Ramos, Esq., Schuster Usera & Aguiló, LLP, San Juan, for Defendant.

## OPINION AND ORDER

PIERAS, Senior District Judge.

### I. INTRODUCTION

Before the Court is Defendants' "Motion for Summary Judgment" (**docket No. 62**) and Memorandum of Law in Support thereof (**docket No. 63**); Plaintiffs' opposition thereto (**docket No. 73**) and Memorandum of Law in Support thereof (**docket No. 74**); and Defendants' reply to Plaintiffs' opposition (docket No. 83).

Plaintiffs in this case are Carlos Fontánez Núñez, a former employee of Janssen Ortho, LLC, his wife Nora Rivera Cardenales, and their conjugal partnership. Defendants are Janssen Ortho, LLC and Johnson & Johnson, Angel Natal, Jorge Ros, Carlos Otero, and Aixa Berríos, all Janssen employees. Plaintiff alleges that he was illegally dismissed based on gender and age discrimination, and further that Defendants' harassment based on sex and age created a hostile work environment for him. Plaintiffs then brought forth this action under Title VII of the Civil Rights Act, codified at 42 U.S.C. § 2000e–2000h–6; and the Age Discrimination in Employment Act, codified at 29 U.S.C. § 621–634, and several claims under Puerto Rico law.

On April 11, 2003, the Court granted Plaintiffs' request for voluntary dismissal of their state law claims against Defendants. (docket No. 19). Thereafter, on June 25, 2003, the Court issued a Partial Judgment by virtue of which it dismissed with prejudice Plaintiffs' claims under Title VII and the ADEA against the individual Defendants (docket No. 28). Therefore, the only causes of action that are currently pending before this Honorable Court are Fontánez' Title VII and ADEA claims against Janssen.

Defendants now move for summary dismissal of Plaintiff's claims, asserting that:

most of Plaintiff's discrimination claims are time-barred; that Plaintiff's hostile work environment, harassment and ADEA claim are insufficient to create an actionable cause of action under the law and are unsupported by the evidence; and lastly, that Janssen has set forth a legitimate, non-discriminatory reason for Plaintiff's termination. The Court agrees with Defendants, and therefore **DISMISSES** this case **WITH PREJUDICE**.

## II. FINDINGS OF FACT

After thoroughly evaluating the facts not in controversy presented by the parties and the record as a whole, the Court makes the following findings of fact: [1]

1. Janssen is a pharmaceutical Company engaged in the production and packaging of pharmaceutical products.

2. Janssen's operations are highly regulated by federal and local government agencies including, without limitation, the Federal Food and Drug Administration (hereinafter "FDA").

3. At all times relevant to this action, Janssen operated a manufacturing and packaging site located in Gurabo, Puerto Rico.

4. Plaintiff Carlos Fontánez commenced working at Janssen on July 15, 1996 as a Quicksolv Project Manager.

5. Fontánez held the referenced position pursuant to a defined term contract.

6. Said contract expired on November 30, 1997.

7. During his tenure as a Quicksolv Project Manager, Plaintiff was initially supervised by Tomás Ramírez, and later on by Angel Natal.

8. The Quicksolv area to which Fontánez was assigned to dealt with the manufacture of several types of quick solv tablets through the use of a specialized technology.

9. In December 1997, Fontánez was made a regular employee of Janssen.

10. Since October 1996, Natal had been employed with Janssen in the position of Quicksolv Manufacturing Manager.

11. When Plaintiff was made a regular employee in December 1997, he also received a promotion to the position of Senior Staff Scientist, and reported to Natal.

12. Natal recommended that Fontánez be appointed to a regular position, and specifically that he be promoted to the position of Senior Staff Scientist.

13. An official announcement of Fontánez' appointment was signed by the then Human Resources Director, Carmen Rodríguez, and by Natal.

14. Effective October 15, 1998, Natal was transferred to the Packaging

---

**1.** Under Local Rule 56, any party opposing a motion for summary judgment must oppose the movant's set of uncontested facts by either accepting, denying or qualifying the movant's set of facts, while at the same time, providing the Court with a statement of facts, properly supported by the record, which the non-movant believes to be contested. Having failed to oppose Defendants' statement of uncontested facts, the Court accepts as true all Defendants' uncontested facts. *See Loc. R. Civ. P. 56; see also Cosme–Rosado v. Serrano–Rodríguez,* 360 F.3d 42, 44–45 (1st Cir.2004) (because Plaintiffs had failed to provide a supported factual basis for their claims against Defendants, the Court properly deemed admitted Defendants' supported facts).

Department and given a new role as Packaging Manager.

15. The Packaging Department was experiencing technical problems that fell well within Natal's area of expertise.

16. Natal's new responsibilities included improving the area's overall efficiency.

17. Effective October 15, 1998, Fontánez received a second promotion, this time to the position of Quicksolv Project Leader.

18. As Quicksolv Project Leader, Fontánez had supervisory responsibility over the Quicksolv Department.

19. During his tenure as a Quicksolv Project Leader, Fontánez reported to Mr. Luis Guillermo Pérez.

20. Pérez occupied the position of Quicksolv and Engineering Director.

21. During the later part of the year 1998, the Quicksolv Department commenced experiencing certain technical production related problems with some of the products manufactured in said area.

22. In early 1999, and in order to comply with certain FDA regulations and resolve certain issues, Janssen made the business decision to cease the production of the product "Propulsid".

23. The referenced decision had a considerable impact on the plant's overall budget and operation.

24. The matter was communicated to local employees through a Memorandum which was prepared in the United States mainland.

25. In March 1999, the Quicksolv Department was closed.

26. This business decision also came as a result of the Company's decision to cease manufacturing Propulsid.

27. According to Fontánez, in January 1999, that is, prior to the closing of the Quicksolv Department, he was chosen by Mr. Paul Clipper, a consultant, as part of an elite team composed of ten (10) company employees who would work in resolving several technical problems that Janssen was experiencing at the time.

28. Fontánez admitted that during the time period that he worked with this team, he retained his duties as a Quicksolv Project Leader, in addition to being assigned other duties.

29. In May 1999, in order to increase operational efficiency, Natal recommended the creation of two managerial positions, one for the Manufacturing area and another one for the Packaging area.

30. Natal recommended that Fontánez be appointed to the newly created Packaging Manager position.

31. Natal made the formal offering of the Packaging Manager position to Fontánez.

32. An official announcement of Fontánez' appointment to the Packaging Manager position was signed by Natal, and by the then Human Resources Manager, Fernando Plaud.

33. Fontánez' duties as Packaging Manager entailed being "instrumental in continuing the development process of Packaging Strategy as well as implementing the activities and projects already in process".

34. Also, Plaintiff would "lead the efforts of the packaging organization

to establish a more robust and reliable operation that fulfills on a consistent basis both base business and Dorado transfer requirements".

35. Specifically, said position included, among others, the following duties:

 (a) Responsibility for the packaging of all dosage forms according to the Packaging instructions, established Standard Operating Procedures, and Product Specifications.

 (b) Responsibility for the effective utilization of labor, materials and equipment to satisfy delivery requirements to corporate customers at the lowest possible cost.

 (c) Responsibility for the preparation and execution of the departmental operational budget.

 (d) Responsibility for the training of his personnel in good manufacturing practices, safety rules, standard operating procedures, personnel policies and practices, and technical operations.

 (e) Responsibility for monitoring operations efficiency according to production standards for productive/non-productive activities material usage, and product yields, which included: suggesting and implementing alternative ways of achieving established standards, aiming at improving production output, increasing yields, waste reduction, set-up reduction, and overall lowering costs.

 (f) Responsibility for the generation of activity reports, projects status reports and technical reports as required by management.

 (g) Responsibility for suggesting and implementing new methods, systems, facilities, and technology that could result in cost improvement projects, better utilization of company resources, and productivity improvement.

 (h) Responsibility for maintaining an effective communication and coordination between the packaging and support departments.

 (i) Responsibility for the development of goals and standards of performance with the participation of his subordinates, which included directing his department to achieve established goals with the assistance of support departments.

 (j) Responsibility for the technical and managerial development of his subordinate supervisors, in order to assist them in reaching their highest attainable level of professionalism, job satisfaction, and contribution to the company.

 (k) Collaborating with Technical Services, Engineering, and Materials Management, in the development, installation, qualification and validation of new products, processes, equipment, systems and facilities by providing information, requirements and human resources.

 (l) Supporting management in the development of long range plans and in special projects.

 (m) Responsibility for accurate and timely labor and production reporting to Finance for monthly period closing.

36. Fontánez' performance as a Packaging Manager only marginally met the Company's legitimate expectations.

37. Specifically, it became evident that Fontánez lacked the ability to make prompt decisions, as well as certain

basic administrative skills required for said position.

38. For example, during Fontánez' tenure as Packaging Manager, a product could not be packaged on time and, thus, could not be sold to the European-based customers which had placed orders for it.

39. Additionally, Plaintiff's inadequate job performance as Packaging Manager had a negative impact on Janssen's relationship with the FDA.

40. Specifically, at the end of 1998 a special report entitled "field alert" concerning a specific product had to be generated by Janssen.

41. A field alert is a notification from the company to the FDA identifying that there might be a problem with a particular product.

42. When a field alert is issued, the plant where the product is being produced, in this case the Gurabo plant, has the responsibility of conducting an investigation of the possible problem, and of implementing any necessary corrective measures.

43. As Packaging Manager, Fontánez had responsibility for implementing corrective measures to resolve this matter with the FDA.

44. Fontánez also failed to implement the corrective measures for which he was accountable.

45. On several occasions, Natal informally provided counseling to Fontánez on the areas in which he needed to improve his job performance.

46. In 1999, Fontánez received a score lower than his prior scores in his performance appraisal.

47. Specifically, Fontánez received a 2.6 numerical rating, which was the lowest possible rating for the "Meets Expectations" category.

48. At that time, Fontánez was specifically advised that he needed to improve the following areas:

 (a) Leadership Skills. Fontánez was told the following regarding this area: "Has to focus in developing a common vision within the packaging department with clear direction and priorities".

 (b) Communication. Fontánez was told the following regarding this area: "Maintain communication within the packaging area—Communication between shifts has to be enforced; a process has to be in place to ensure right communication between planner and packaging area roles; effective and efficient meetings have to be regularly coordinated with area leadership team".

 (c) Driving issues to closure. Fontánez was specifically reminded that he needed to "close loops" when an issue was identified, and to continue monitoring afterwards.

49. On February 4, 2000, Fontánez received an additional copy of Defendant's Employee Manual.

50. During his deposition, Fontánez admitted that the Employee Manual included Janssen's rules of conduct.

51. On March 31, 2000, Aixa Berríos, who occupied the position of Packaging and Materials Manager since January 25, 2000, and was Fontánez' supervisor at the time, met with Fontánez to discuss several performance issues.

52. In said memorandum, Berríos stated that a conversation between her and Fontánez had tak-

en place on that date after a number of incidents in which Fontánez was involved and in which his performance level had consistently fell below the expectations for his position.

53. Specifically, Berríos emphasized Fontánez' failure to take corrective action concerning disciplinary issues in his work area in relation to employees who were under his supervision.

54. In her March 31, 2000 memorandum, Berríos also discussed issues related to an audit performed by a contractor by the name of Hank Avallone.

55. Berríos specifically noted that during the audit process Fontánez had failed to show that he mastered the specifics of the filing process of creams.

56. More importantly, the information provided by Fontánez during the audit created the impression of an out-of-compliance operation at that particular center.

57. Berríos noted that Fontánez knew that he had the responsibility of not responding to any questions if he did not have the correct information, and of making sure that he had the right resources during an inspection in order to address the inspector's concerns and questions.

58. In her March 31, 2000 memorandum, Berríos concluded that Fontánez should have demonstrated absolute control over the functioning of the packaging area.

59. She further emphasized that he had consistently failed to demonstrate diligence, knowledge, leadership and sound judgment when performing his duties as a manager.

60. Fontánez was specifically advised that the referenced memorandum had the purpose of documenting what was considered to be performance issues.

61. Plaintiff was also advised that if no improvement in his performance was observed, a recommendation for further disciplinary action would proceed.

62. Fontánez worked as a Packaging Manager up until February 2001.

63. On said date, Fontánez was assigned to the position of Senior Packaging Process Facilitator.

64. As a Senior Packaging Process Facilitator Plaintiff had supervisory responsibilities over approximately thirty two (32) employees.

65. Specifically, his roles and responsibilities included:

(a) Working with other process facilitators to ensure operational excellence throughout the supply chain.

(b) Monitoring and measuring process performance, and implementing corrective actions.

(c) Working as a team member with the process leader and other members of a process centered organization to ensure that process outcomes were achieved.

(d) Working with the process centered organization's members to troubleshoot and resolve process and technical problems.

(e) Ensuring that the process was in compliance with the good manufacturing practices.

(f) Determining and allocating/relocating resources to the process as needed in his shift.

(g) Providing guidance and coaching associates on the supply chain process.

(h) Teaming with the members of the process centered organization to seek out and enable process improvements.

(i) Participating in the process centered organization's decision making process.

66. During the time that Plaintiff worked as a Senior Packaging Process Facilitator he was supervised by Berríos.

67. Berríos occupied the position of Materials and Packaging Manager, and later on, the position of Process Leader.

68. Fontánez' change to the Senior Packaging Process Facilitator position was taken as part of Janssen's broader decision to implement what became known as the "Lean Manufacturing Process".

69. The Lean Manufacturing Process sought to reduce operating costs and expenses by eliminating unnecessary process steps.

70. Plaintiff admitted that many positions within Janssen were negatively impacted by the implementation of the Lean Manufacturing Process.

71. Specifically, as part of the implementation of the Lean Manufacturing Process, Fontánez' position as Packaging Manager was eliminated.

72. Rather than terminating Fontánez, Janssen in good faith offered him the Senior Packaging Process Facilitator position.

73. Natal, Berríos and Ros participated in the decision to offer Fontánez the alternative of assuming the Senior Process Facilitator position.

74. Carlos Otero started to work with Janssen as Human Resources Director in early 2001, a position which he has continued to occupy since then.

75. At the time when the Senior Packaging Process Facilitator position was offered to Fontánez, both Berríos and Otero met with Fontánez to discuss with him whether he would accept said re-assignment, and the sensitive duties that he would be performing in said capacity.

76. Specifically, at that time Fontánez was advised of the level of operational detail required by said position, and Fontánez accepted the re-assignment knowing the responsibilities that such a sensitive position entailed.

77. During the year 2001, Jorge Ros occupied the position of Plant Manager.

78. By memorandum dated March 9, 2001, Berríos documented several performance issues in connection with Fontánez' new role as a Senior Packaging Process Facilitator.

79. The matters addressed in Berríos' March 9, 2001 memorandum included:

(a) Fontánez' tendency to delegate his duties to persons who occupied positions of a lower hierarchy within the company's structure, or of lesser responsibility than his and specific instances of inadequate delegation of duties were addressed in said memorandum. Berríos also indicated that by delegating his duties in an inadequate manner, Fontánez overburdened

other employees of the Packaging area.

(b) Fontánez' tendency to address others with excessive authority and to frequently reflect anger when dealing with daily occurrences. In the March 9, 2001 memorandum Berríos stated that by so doing, Fontánez created mistrust among the employees and did not encourage team work. Berríos further stated that employees of the Incoming and Warehouse Departments had specifically complained to management about Fontánez' attitude.

(c) Fontánez' tendency not to maintain himself knowledgeable about the status of the packaging area's operational flow. In the March 9, 2001 memorandum, Berríos pointed out that this situation created doubts and misunderstandings which, in turn, resulted in the operational and technical personnel's lack of trust in Fontánez.

(d) An incident which took place in early March 2001 and during which Bottles Line No. 2 remained inoperative for a considerable time period awaiting the delivery of certain materials from Janssen's warehouse area. In the March 9, 2001 memorandum, Berríos emphasized two aggravating circumstances related to this incident:

　(i) Ros had personally visited the packaging area at that time and had asked Fontánez for an explanation for the down time and Fontánez lacked the necessary facts to answer Ros' inquiry.

　(ii) Fontánez was well aware of the fact that the production at issue had been ranked as a priority.

(e) Fontánez' peers and his subordinates did not trust him as a Senior Packaging Process Facilitator. In the March 9, 2001 memorandum Berríos noted that this resulted in Fontánez' failure to exercise the leadership expected from him.

(f) Fontánez' tendency to constantly avoid decision making. This included his tendency to be extremely cautious and to avoid taking calculated risks that could have improved processes. In the March 9, 2001 memorandum, Berríos noted that this was a constant criticism expressed by both the technical and operational components of the Packaging area. Moreover, Berríos emphasized that several employees had expressed their frustration with this matter.

(g) The existence of approximately fifteen (15) complaints in Fontánez' area that had not been investigated within the established time periods.

80. Based on the above-referenced factors, Berríos concluded that Fontánez' performance as a Senior Packaging Process Facilitator was unacceptable, and that said position had to be occupied by someone who mastered all of the position's essential and basic functions.

81. By memorandum dated March 20, 2001, Berríos made the recommendation to terminate Fontánez due to his inadequate job performance as a Senior Packaging Process Facilitator, as well as his prior performance issues.

388

82. Berríos' recommendation was exclusively addressed to Otero and Ros.

83. In the March 20, 2001 memorandum, Berríos specifically recommended Fontánez' termination based on the following facts:

(a) The matters previously addressed in Berríos' above-mentioned March 9, 2001 memorandum. In her March 20, 2001 memorandum, Berríos emphasized that the need to document Fontánez' lack of compromise, his failure to pay adequate attention to his work, and the absence of a desire on his part to do his job effectively, had not been an isolated but rather a frequent occurrence. Specifically, Berríos pointed out that Fontánez' inadequate job performance as a manager had been documented not only in her March 9, 2001 memorandum, but also in a prior memorandum, and in his last two performance evaluations in which he received a 2.6 rating.

(b) An incident which took place on March 16, 2001. On said date, Fontánez' failure to contact the second shift Process Facilitator resulted in the areas' failure to comply with its scheduled priorities. On top of that, Fontánez failed to take remedial action the day after the incident, and when confronted by Berríos, Fontánez showed a total lack of interest both in finding out about the occurrence itself and its causes. Consistent with his prior deficient performance history, Fontánez once again lacked the necessary facts to answer Berríos' and management's legitimate questions regarding the incident. In her March 20, 2001 memorandum Berríos emphasized that prior to the occurrence, Fontánez was well aware of the areas' priorities on the day of the incident, inasmuch as she had personally communicated those to him, and that the matter had resulted in a considerable delay in the delivery of products to a Canadian client. Finally, Berríos expressed her concern for the negative impact that this incident had already had in terms of the plant's credibility and status.

84. The decision to terminate Fontánez was reached at Berríos' recommendation which was, in turn, cleared by the local Human Resources Office.

85. Ros, the ultimate decision-maker, was in complete agreement with Berríos' recommendation based on his own experience with Fontánez as well as the above-referenced facts.

86. Natal did not play a role in the taking of said decision, nor in the recommendation to terminate Fontánez and was not consulted in relation to said decision.

87. Prior to Fontánez' termination, and at Berríos' request, an investigation was conducted by Otero regarding the March 16, 2001 incident.

88. As part of the investigation, Otero interviewed Fontánez, who admitted to Otero that he had gone out of the plant on the day of the March 16, 2001 incident, and that when he returned to the plant he saw the second shift facilitator, Ms. Evelyn Santiago talking with the employee to whom he had allegedly delegated the matter, and that he "assumed" that they were talking about the matter.

89. As part of the investigation, Otero also interviewed Santiago.

90. Fontánez' inadequate job performance while he reported to Berríos required constant supervision on her part, which was totally unacceptable at his job level.

91. The kind of decision-making delegated to Fontánez had the purpose of avoiding upper management's constant involvement in operational details.

92. During the course of Plaintiff's employment with Janssen, and notwithstanding the frequent restructuring processes that were implemented by Janssen throughout those years, Plaintiff's salary was never affected.

93. In fact, during his tenure with Janssen, Plaintiff's salary increased every year.

94. While employed with Janssen, Plaintiff received and read Janssen's Employee Manual.

95. During his tenure with Janssen, Plaintiff attended various training sessions which took place at the Dorado del Mar Hotel.

96. Plaintiff's stay at the hotel, as well as other expenses, were paid by Janssen.

97. Plaintiff requested the opportunity to participate in those seminars to Natal.

98. At his deposition, Fontánez identified the following events or acts which allegedly constitute discrimination on account of age on Janssen's part:

 (a) Natal would call him "gray haired".

 (b) Natal would tell Plaintiff that he looked like Ronaldo Nigaglioni, a co-worker who Natal allegedly considered to be slow and incompetent.

 (c) One of Fontánez' co-workers by the name of Francisco Franco would tell Fontánez to tie up his hair and put some mousse on it.

 (d) Fontánez' co-workers would allegedly call him "la cacatúa" (the cockatoo) because of his gray hair.

 (e) At one point, Jorge Ros told him that he did not expect a man with so many years in the industry to halt operations for such a long period of time.

99. Fontánez did not feel discriminated on account of his age due to any other act or event.

100. Fontánez could not identify who used called him "la cacatúa" and admitted that nobody at Janssen called him "la cacatúa" directly.

101. Plaintiff acknowledged that these comments were merely a joke among his co-workers.

102. Fontánez also admitted that the alleged incident whereupon Natal called Fontánez "gray haired" occurred back in the year 1997.

103. Fontánez further admitted that he did not feel discriminated on account of his age by any person other than Natal.

104. At the time of his deposition, Fontánez was approximately 45 years old, and Natal 42.

105. According to Fontánez, he commenced experiencing problems with Natal in the year 1997.

106. According to Fontánez, in 1997 John Ortiz (hereinafter "Ortiz") was employed by Janssen's Gurabo plant as a Quality Director.

107. On or about 1997, Ortiz left Janssen's Gurabo plant and relocated to the United States mainland.

108. At his deposition, Fontánez admitted that his sexual harassment complaint is premised on the following alleged incidents:

 (a) At one point, Natal came out of Mr. Fábregas' office and told Fontánez that Fábregas had "left his ass on fire". This comment was not directed to Fontánez, but rather to Natal himself.

 (b) Natal allegedly told Fontánez that: "I am horny and I can't find a faggot. I'm in such a state that I'll give it to myself". Natal neither invited Fontánez to go out with him, nor told him that he was the person Natal was supposedly looking for.

 (c) Natal told Fontánez that he (Natal) was going out with Ortiz, and that he had spent a Sunday alone with Ortiz in his boat, an alleged comment related to a situation between Natal and Ortiz.

 (d) Natal would put his hand in his buttocks and would fix his pants in the front.

 (e) Two of Fontánez' co-workers would call him "John Ortiz".

 (f) One of Fontánez' co-workers by the name of Raymond Rivera would ask him whether he was gay.

 (g) Natal told Fontánez that he (Fontánez) was a pharmacist just as Ortiz and also told him that "all pharmacists are faggots".

 (h) At one point a co-worker by the name of José Martínez got close to Fontánez and told him "do not move back or you are dead, you will die".

109. Fontánez did not feel sexually harassed by any other act or event.

110. Fontánez admitted that most of the above-referenced incidents that allegedly form the basis of his sexual harassment claim took place back in the year 1997.

111. The so-called comments which related to John Ortiz occurred in the year 1997.

112. The alleged remark whereupon Natal allegedly told Fontánez that he was a pharmacist just as Ortiz and that all pharmacists are gay, arguably occurred while Plaintiff worked for the Quicksolv department back in the year 1997.

113. The situation in which José Martínez allegedly told Fontánez not to move back or he would die also took place in the year 1997.

114. A few of the above-referenced situations allegedly occurred in the year 2001.

115. Fontánez alleges that the situation where Natal would put his hand in his buttocks and would fix his pants, and the alleged comment by Natal in the sense that he was horny and looking for a homosexual occurred in January or February of 2001.

116. According to Fontánez, the persons who allegedly sexually harassed him were (1) Natal, (2) José Martínez and (3) Raymond Rivera.

117. Fontánez alleges that a hostile work environment existed because:

 (a) Natal used vulgar language at the workplace.

 (b) Natal came in the mornings, closed the door to his office and

would not let him into his (Natal's) office.

118. Fontánez could not identify any other fact related to his hostile environment claim.

119. Fontánez admitted that Natal did not refer to him directly when he used vulgar language, and that the vulgar words were spoken in the presence of everyone.

120. Fontánez admitted that the alleged hostile work environment created by Natal was directed not only against him, but also against the other employees in his area.

121. Additionally, as to the issue that Natal would not let him into his office, Plaintiff admitted that Natal would not let anyone into his office.

122. On May 2, 2001, Fontánez filed a charge with the Anti–Discrimination Unit of the Puerto Rico Department of Labor.

123. At all times relevant to this action Janssen had well established policies designed to prevent discriminatory conduct and sexual harassment in the workplace.

124. These policies included a complaint mechanism for employees.

125. On July 15, 1996, Fontánez received a copy of Janssen's Sexual Harassment Policy.

126. According to Fontánez, the above-referenced situations affected his work in the following ways:

(a) He was nervous while at work.

(b) He allegedly had to do more than the other employees in order to obtain recognition.

(c) He had to be careful with what he expressed at work.

(d) He had to be low key during meetings because he would be told to shut up.

127. As to the sexual harassment that Fontánez allegedly suffered, the only managerial personnel who according to him was made aware of the alleged harassment by Fontánez himself was Pérez.

128. The conversation whereupon Fontánez made Pérez aware of the alleged sexual harassment took place in the year 1997.

129. Pérez did not play a role in Janssen's decision to terminate Fontánez.

130. Even though Fontánez was well aware of Janssen's sexual harassment policies and of the complaint mechanism established therein, he never used them after his alleged conversation with Pérez back in 1997.

## III. CONCLUSIONS OF LAW

### A. *Legal Standard for Summary Judgment*

■ Summary judgment serves to assess the proof to determine if there is a genuine need for trial. *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990). Pursuant to Rule 56© of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the record, including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, viewed in the light most favorable to the nonmoving party, [in this case the plaintiff,] reveals no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Zambrana–Marrero v. Suárez–Cruz*, 172 F.3d 122, 125 (1st Cir.1999) (stating that summary judgment is appropriate when, after evaluating

the record in the light most favorable to the non-moving party, the evidence "fails to yield a trial worthy issue as to some material fact"); *Goldman v. First Nat'l Bank of Boston,* 985 F.2d 1113, 1116 (1st Cir.1993); *Canal Insurance Co. v. Benner,* 980 F.2d 23, 25 (1st Cir.1992). The Supreme Court has stated that "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In this way, a fact is material if, based on the substantive law at issue, it might affect the outcome of the case. *See Mack v. Great Atl. and Pac. Tea Co., Inc.,* 871 F.2d 179, 181 (1st Cir.1989).

In a summary judgment motion, the movant [in this case Defendant], bears the burden of "informing the district court of the basis for its motion and identifying those portions of the [record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). Once the movant meets this burden, the burden shifts to the opposing party [in this case Plaintiff] who may not rest upon mere allegations or denials of the pleadings, but must affirmatively show, through the filing of supporting affidavits or otherwise, that there is a genuine issue of material fact for trial. *See Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Goldman,* 985 F.2d at 1116.

**B. Summary Judgment Standards in the Context of ADEA Cases**

■ In order to survive a motion for summary judgment in the context of an ADEA action, "a plaintiff must establish [that] at least a genuine issue of material fact [exists] on every element in his case in chief." *Vega v. Kodak Caribbean, Ltd.,* 3 F.3d 476, 479 (1st Cir.1993) (quoting *Mesnick v. General Elec. Co.,* 950 F.2d 816, 825 (1st Cir.1991)).

■ There are two distinct frameworks under ADEA for assessing evidence of discrimination, both of which are based on whether the evidence proffered by a plaintiff is direct or of a circumstantial nature. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Direct evidence "consists of statements by a decision-maker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Febres v. Challenger Caribbean Corp.,* 214 F.3d 57, 60, (1st Cir. 2000). Such evidence, standing alone, can show a discriminatory animus. *See Jackson v. Harvard Univ.,* 900 F.2d 464, 467 (1st Cir.1990). If believed by the factfinder, direct evidence warrants a burden shift and that a mixed-motives instruction be given to the jury. *Febres,* 214 F.3d at 60–61. In the absence of direct evidence, age discrimination claims are circumstantial in nature, and are reviewed under the burden-shifting *McDonnell Douglas* framework. *Suárez v. Pueblo Int'l Inc.,* 229 F.3d 49, 54 (1st Cir.2000); *Greenberg v. Union Camp Corp.,* 48 F.3d 22, 26 (1st Cir.1995). In this case, Plaintiffs have not alleged, and the record does not contain any direct evidence of age discrimination. Therefore, the *McDonnell Douglas* framework guides this Court's inquiry.

■■ When applied in an ADEA context, the *McDonnell Douglas* standard requires that a plaintiff set forth a prima facie case by showing that he (1) is over 40 years of age; (2) met the employer's legitimate job performance expectations; (3) experienced an adverse employment action, and (4) the employer had a continuing need for the same services that he was

performing and replaced the plaintiff with a person of roughly the same qualifications. *Williams v. Raytheon Co.*, 220 F.3d 16, 18 (1st Cir.2000); *Suárez*, 229 F.3d at 53; *Vega*, 3 F.3d at 479; *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1335 (1st Cir.1988). If a plaintiff sets forth this case, then the burden of production, but not the burden of persuasion, shifts to the defendant employer to articulate a legitimate non-discriminatory justification for the employment decision. *Hazel v. United States Postmaster Gen.*, 7 F.3d 1, 3 (1st Cir.1993).[2] Once an employer articulates a legitimate non-discriminatory purpose for the employment decision, the presumption of discrimination established by the prima facie case disappears. *See Sánchez Sepúlveda v. Motorola Electrónica De Puerto Rico, Inc.*, 988 F.Supp. 34, 37 (D.Puerto Rico 1997) (Pieras, J.), *aff'd* 187 F.3d 622 (1st Cir.1998). At this point, in order to survive a judgment as a matter of law, a plaintiff must prove by a preponderance of the evidence that the employer's stated reason for the employment decision was pretextual and that the real reason was age-based animus. *Baralt v. Nationwide Mut. Ins. Co.*, 251 F.3d 10, 16 n. 8 (1st Cir.2001) citing *Suárez*, 229 F.3d at 53; *see also Raytheon Co.*, 220 F.3d 16.[3]

## C. *Time Bar/Laches in the Title VII Discrimination Context*

Defendants' first claim is that most of Plaintiff's allegations of age discrimination and harassment are time barred because they occurred more than 300 days before the filing of the claim with the Equal Employment Opportunity Commission ("EEOC") in 2001. The Court agrees.

■■ The Court finds that the "continuing violation doctrine" does not preserve Plaintiff's claims. The Supreme Court has recently elaborated on the meaning of the term "continuing violation", holding that a discrete discriminatory act transpires only at the time it takes place, even if it was related to acts that were timely filed. *National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 122 S.Ct. 2061, 2073, 153 L.Ed.2d 106 (2002). "Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the 180–or 300–day time period after the discrete discriminatory act occurred." *Morgan*, 122 S.Ct. at 2072. The Court made plain that "[d]iscrete acts such as termination, failure to promote, denial of transfer or refusal to hire ... constitute[ ] a separate actionable unlawful employment practice." *Id.* at 2073; *see also Landrau–Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 612 (1st Cir.1998) (holding that even where a plaintiff alleges a violation within the appropriate statute of limitations period, the continuing violation claim will fail if the plaintiff was or should have been aware that he was being unlawfully discriminated against while the earlier acts, now untimely, were taking place) (*quoting Provencher v. CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir.1998)); and *Miller v. N.H. Dep't of Corr.*, 296 F.3d 18, 22 (1st Cir.2002). In the case at bar, Plaintiff is claiming

---

**2.** The burden of persuasion, as opposed to the burden of production, remains with the plaintiff throughout, regardless of whether the evidence presented in an ADEA action is direct or circumstantial. *See Serrano–Cruz v. DFI Puerto Rico Inc.*, 109 F.3d 23, 26 (1st Cir. 1997).

**3.** The United States Supreme Court has stated that "[p]roof that the defendant's explanation is unworthy of credence is ... one form of circumstantial evidence that is probative of intentional discrimination." *Reeves v. Sanderson Plumbing Products Inc.*, 530 U.S. 133, 134, 120 S.Ct. 2097, 2102, 147 L.Ed.2d 105 (2000).

harassment since *1997,* but it was not until *May 2, 2001* when he filed his claim. Therefore, all actions in this case occurring before July 25, 2000, 300 days before the claim was filed, are time barred and there-fore, the Court will not consider them in its analysis.

### D. *Plaintiffs' ADEA Claim*

■ The ADEA makes it unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to [her] compensation, terms, conditions or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). To prevail on a claim under the ADEA, a plaintiff must first establish a prima facie case. This requires the plaintiff to show that "(1) he was at least forty years of age; (2) his job performance met the employer's legitimate expectations; (3) the employer subjected him to an adverse employment action (e.g., an actual or constructive discharge); and (4) the employer had a continuing need for the services [the claimant rendered]." *González v. El Día, Inc.,* 304 F.3d 63, 68 n. 5 (1st Cir.2002) (*citing Suárez,* 229 F.3d at 53 (1st Cir.2000)).

■ While the first prong of the test is easily met, the Court finds that Plaintiff has not met the second prong, proving that he was performing the duties of his job adequately. While it is true that Plaintiff's first evaluations were satisfactory, and that he received several promotions, the record indicates that Plaintiff's performance in the positions of Packaging Manager and Senior Packaging Facilitator were unacceptable to Janssen. In fact, the record is clear that while at Janssen, Plaintiff occupied five different positions, to wit: Quicksolv Project Manager, Senior Staff Scientist, Quicksolv Project Leader, Packaging Manager, and Senior Packaging Facilitator. The record, however, is replete

with complaints from Plaintiff's superiors during his last two positions with the company—the Packaging Manager position, and the Senior Packaging Facilitator position—detailing his lack of attention to detail, the halted production lines on several occasions, his lack of good judgment, his tendency to delegate his duties to persons who occupied positions of a lower hierarchy within the company's structure, his lack of leadership, his tendency to address others with excessive authority and with anger, and his tendency to remain unknowledgeable about the status of the packaging area's operational flow, among others.

■ In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but "whether the employee was performing well at the time of [her] termination." *Karazanos v. Navistar Intern. Transp. Corp.,* 948 F.2d 332, 336 (7th Cir.1991). Additionally, Courts have held that the general statements of co-workers, indicating that a plaintiff's job performance was satisfactory, are insufficient to create a material issue of fact as to whether a plaintiff was meeting her employer's legitimate employment expectations at the time she was terminated. *See, e.g., Dey v. Colt Constr. & Dev. Co.,* 28 F.3d 1446, 1460 (7th Cir.1994) ("cases ... give little weight to statements by supervisors or co-workers that generally corroborate a plaintiff's own perception of satisfactory job performance."); *see also Peele v. Country Mut. Ins. Co.,* 288 F.3d 319, 329 (7th Cir.2002). It is to Janssen's upper management that the Court must look, and therein it has found that Plaintiff's performance was not meeting Janssen's standards. As stated, the record is replete with evidence from Plaintiff's superiors which demonstrates

their unhappiness with Plaintiff's work. Therefore, Janssen did not act improperly in dismissing him.

 Even if the Court was undecided on the issue of whether Plaintiff met the requirements of the second prong of the prima facie case analysis, that he was performing his job in a satisfactory manner, "this court may advance to an ultimate issue in a summary judgment analysis and consider the discrimination question notwithstanding a dispute over a fact necessary for a prima facie case." *EEOC v. Our Lady of the Resurrection Med. Ctr.,* 77 F.3d 145, 149 (7th Cir.1996); *see also Jayasinghe v. Bethlehem Steel Corp.,* 760 F.2d 132, 135 (7th Cir.1985) ("The prima facie threshold is no longer a relevant issue once the defendant has come forward with evidence of legitimate reasons for its actions that would rebut a prima facie showing of discrimination."). Thus, the Court will now consider it in deciding whether Defendant can establish legitimate, nondiscriminatory reasons for the firing. *See Alvarez Cabrera v. Trataros Constr.,* 184 F.Supp.2d 149 (D.Puerto Rico 2002) (holding that the prima facie case and the employer's non-discriminatory reason are "irretrievably intertwined" where the employer asserts that it discharged the plaintiff because her job performance was not satisfactory, and thus it was necessary to examine Defendants' non-discriminatory reasons) *quoting Lawrence v. Northrop Corp.,* 980 F.2d 66, 69 (1st Cir.1992).

 In so doing, for the same reasons espoused above, the Court finds that Defendant has advanced a strong, objectively verifiable set of reasons for Plaintiff's dismissal: his lack of attention to the detail that his work entailed, his lack of leadership, that he consistently failed to demonstrate diligence, knowledge, leadership and sound judgment when performing his duties as a manager, and the numerous complaints against his management style, among others. Furthermore, Defendant has adequately advanced other reasons, like the termination of the Quicksolv operation, some restructuring of its work force, Plaintiff's lack of work ethic in the last two positions he occupied at the company, his inadequate job performance, and his failure to take quick remedial action, all of which was documented on paper, to justify his dismissal.

Furthermore, while at Janssen, it is undisputed that Plaintiff held five different positions, each one with a higher salary than the last, and did not perform well in the last two. Plaintiff points to nothing that casts doubt upon the legitimacy of Defendants' reasons for dismissing him, but his self-serving opinion, nor does he proffer any substantial evidence that would permit a rational jury to find that Defendant somehow rigged his promotions in a fashion designed to ensure that the Plaintiff's work quality would be affected. After five promotions, Plaintiff is hard-pressed to show this Court how any discrimination was effected. His age discrimination claims are therefore **DISMISSED WITH PREJUDICE.**

**E. *Plaintiffs' Title VII Claim for Sexual Harassment/Hostile Work Environment***

 To succeed in a hostile work environment sexual harassment claim, Plaintiff must prove that discriminatory intimidation so permeates the workplace that it is sufficiently severe and pervasive to alter the conditions of a victim's employment and create an abusive environment. *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Furthermore, the alleged conduct must create an objectively hostile environment—one which a reasonable person would find hostile or abusive, as well as an

environment that a person would find subjectively hostile or abusive to the victim. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295.

■ The Court finds that Plaintiff has failed to prove his case, because Defendants' actions and comments do not rise to the level of an actionable hostile work environment under Title VII. Likewise, the Court finds that the severity and pervasiveness requirement of Defendant Natal's conduct towards Plaintiff is not met. Indeed, it falls to Plaintiff to demonstrate that (1) "the harassment [she experienced during the final four days of her employment], was sufficiently severe or pervasive to alter the conditions of [her] employment," *Provencher*, 145 F.3d at 13, and (2) that the work environment was "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that [Conto] in fact did perceive to be so". *Conto v. Concord Hosp., Inc.* 265 F.3d 79, 82 (1st Cir.2001); *see also Faragher v. City of Boca Ratón*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

■ Courts have stated that "whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23, 114 S.Ct. 367, 126 L.Ed.2d 295; *see also Conto*, 265 F.3d at 82. First, the period during which Defendants' conduct remained actionable substantially undermines Plaintiff's contention that the conduct was either sufficiently frequent or severe. Second, however insensitive the comments were, the Court finds they were neither "physically threatening [n]or humiliating, [but at most] mere

offensive utterance[s]." *Id.* Finally, Plaintiff has not demonstrated that any conduct to which he was subjected 'unreasonably interfered' with his work performance.

The harassment conduct that Plaintiff complained of is detailed in four (4) instances, to wit: (1) that at one point, Natal came out of Mr. Fábregas' office and told Fontánez that Fábregas had "left his ass on fire", however, this comment was not directed to Fontánez, but rather to Natal himself; (2) that Natal allegedly told Fontánez that: "I am horny and I can't find a faggot. I'm in such a state that I'll give it to myself", but Natal neither invited Fontánez to go out with him, nor told him that he was the person Natal was supposedly looking for; (3) that Natal would put his hand in his buttocks and would fix his pants in the front; (4) and that one of Fontánez' co-workers by the name of Raymond Rivera would ask him whether he was gay.

Plaintiff admitted in his deposition that he did not feel sexually harassed by any other act or event. There were a few other incidents (the gray-haired incidents, the "cacatúa" incidents, and the Ortiz/gay comments) that allegedly form the basis of Plaintiff's sexual harassment claim which took place in 1997, which the Court did not consider because they were time barred.

Plaintiff further alleges that a hostile work environment existed because: Natal used vulgar language at the workplace and because Natal (curiously, the person Plaintiff was alleging was harassing him), arrived in the mornings, closed the door to his office and would not let him into his (Natal's) office. According to Fontánez, the above-referenced situations affected his work in the following ways: (a) he was nervous while at work, (b) he allegedly had to do more than the other employees in order to obtain recognition, (c) he had to be careful with what he expressed at work

and (d) he had to be low-key during meetings because he would be told to shut up.

A brief survey of cases similar to this one support the Court's reasoning by showing that the behavior in question does not rise to the level of severity or pervasiveness generally considered actionable by other courts. *See Morgan v. Massachusetts Gen'l Hosp.*, 901 F.2d 186, 192–93 (1st Cir.1990) (conduct not sufficiently severe or pervasive to implicate Title VII liability where male co-worker stood behind plaintiff to cause physical contact, surreptitiously looked at plaintiff's privates in the restroom, 'hung around him a lot,' and engaged in unwanted touching, all over a two week period); *Hopkins v. Baltimore Gas and Elec. Co.*, 77 F.3d 745, 753–54 (4th Cir.1996) *cert. denied,* 519 U.S. 818, 117 S.Ct. 70, 136 L.Ed.2d 30 (1996) (male supervisor's behavior not actionable when it involved bumping into male employee, kissing him at his wedding, staring at him in the bathroom, commenting on his appearance, and making sexual remarks to him where the acts occurred intermittently and did not entail an explicit sexual proposition); *Harris*, 510 U.S. at 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (stating that it must be discriminatory intimidation, ridicule, and insult which create a hostile environment); *Mullenix v. Forsyth Dental Infirmary for Children*, 965 F.Supp. 120, 151–156 (D.Mass.1996) (Female employee's being laughingly told to wear a short skirt to a meeting, asked why she should get a paycheck when she had a husband, and called hysterical do not present genuine issues of material fact of an objectively hostile work environment). Furthermore, the Court does not find, according to Plaintiff's own testimony, that the situation in the case at bar 'unreasonably interfered' with his work performance. After all, being nervous while at work, working harder and being low-key during meetings can hardly be construed as unreasonable interference with work.

Finally, the Court can see that Janssen had well established anti-harassment and anti-discrimination policies which Plaintiff received a copy of on July 16, 1996, when he began working with the company. The policy had instructions about the employees' rights and mechanisms to follow in airing their grievances, which was available to Plaintiff and *which he failed to take advantage of.* Finding no contested issues of material fact regarding this claim, the Court **DISMISSES WITH PREJUDICE** Plaintiff's harassment and hostile work environment claims.

## IV. CONCLUSION

For the aforementioned reasons, and finding no contested issues of material fact regarding any of Plaintiffs' federal claims, the Court hereby **DISMISSES WITH PREJUDICE** all claims arising from Title VII of the Civil Rights Act, 42 U.S.C. § 2000e–2000h–6; and the Age Discrimination in Employment Act, 29 U.S.C. § 621–634.

**IT IS SO ORDERED.**